In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3826

AVDO HUKIC,

*Plaintiff-Appellant,*

*v.*

AURORA LOAN SERVICES and OCWEN
LOAN SERVICING,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 4950—**Virginia M. Kendall**, *Judge.*

ARGUED JANUARY 23, 2009—DECIDED NOVEMBER 20, 2009

Before BAUER, EVANS, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Avdo Hukic obtained a six-figure mortgage with an interest rate of 10.65%. It allowed him to pay his taxes and insurance premiums directly to the entities owed payment, but only if he promptly furnished proof to his mortgage servicer that he was making those payments. Because Hukic did not submit such proof, Aurora Loan Services, and later Ocwen Loan Servicing, also made tax and insurance

payments on Hukic's behalf. They notified Hukic of a corresponding increase in his monthly amount due, but Hukic did not change the amount he paid to them each month. The amounts Hukic owed for taxes and insurance and a deficiency that resulted from the incorrect processing of one money order led Aurora and Ocwen to report Hukic as delinquent to consumer reporting agencies. Although it turns out that Hukic had been paying taxes directly to the county all along, we must affirm the judgment in the defendants' favor because Hukic did not comply with the terms of his agreement that required him to submit proof of payment. Aurora and Ocwen were therefore justified when they reported that Hukic had defaulted on his loan. We affirm the grant of summary judgment in favor of the defendants on Hukic's claims for breach of contract, tortious interference, and violation of the Fair Credit Reporting Act (FCRA). We also affirm the dismissal of Hukic's claims for defamation and intentional infliction of emotional distress.

## I. BACKGROUND

Avdo Hukic obtained a mortgage from Life Savings Bank in 1997. The mortgage was for $119,700 and had an interest rate of 10.65%. The mortgage agreement required that he make monthly payments of $1,334.42 as well as pay taxes, insurance premiums, and other charges or fines. The agreement allowed Hukic as the borrower to pay the taxes and insurance premiums directly to the entities owed payment, provided that

> Borrower shall promptly furnish to Lender all notices of amounts to be paid under this para-

> graph. If Borrower makes these payments directly, Borrower shall furnish to Lender receipts evidencing the payments.

Hukic got off to a good start, making monthly payments of $1,335 in a timely fashion. Then, in April 1998, Hukic submitted a money order made out in the amount of $1,335 to Life Savings Bank. All should have been fine, as the amount was fifty-eight cents more than what he was required to pay, and he submitted it to the bank on time. For some reason, however, the money order was only processed as a payment of $1,135, and the bank only received that amount.

Life Savings Bank assigned Hukic's loan to Aurora Loan Services the next month and forwarded $1,135 as Hukic's April payment. Aurora notified Hukic that his April payment was deficient and asked Hukic to remit $200 and request a refund from the money order's issuer. Hukic did not do so, later saying he did not have the time to do that. When Hukic made monthly payments to Aurora thereafter, Aurora always applied his payment first to the amount that was due from the previous month, so Aurora's records continued to show Hukic as one month delinquent.

When Life Savings Bank assigned Hukic's loan to Aurora, it also advised Aurora that Hukic's hazard insurance had expired. Aurora wrote to Hukic and told him that if evidence of current insurance was not received within sixty days, Aurora would set up an escrow account to pay the $1,716 annual premium for the upcoming policy year, pursuant to the terms of the mortgage.

Aurora did not receive evidence of up-to-date hazard insurance from Hukic, so it advanced the funds. Aurora also paid Hukic's property taxes of $1,927 for the first half of 1999 because Hukic had not submitted evidence that he was paying the taxes on his own. Pursuant to the terms of the mortgage, Aurora set up an escrow account for the reimbursement of the property taxes. Aurora notified Hukic of the increases to the amount due each month as a result of these accounts, but he continued to make monthly payments of $1,335. Aurora reported Hukic's loan as delinquent to consumer credit reporting agencies in November of 1999.

About four months later, Aurora assigned Hukic's loan to another company, Ocwen Loan Servicing. Records Ocwen received indicated that Hukic had not made his January mortgage payment. On March 13, 2000, Ocwen mailed Hukic a notice of default. It stated that he needed to pay $7,261.16 by April 12, 2000 to cure the deficiency in his account, and that failure to cure the default could result in foreclosure proceedings. On September 8, 2000, Ocwen advanced $1,116 to pay Hukic's property taxes and made an adjustment to his escrow account. Ocwen also informed Hukic that month that if he had paid the property taxes directly to the county without informing Aurora or Ocwen, he should obtain a refund of the property taxes and then remit the refund to Ocwen to cure the deficiency in the escrow account. Hukic did neither. When Ocwen did not receive proof of payment, it advanced funds on two occasions in 2001 to pay Hukic's property taxes and adjusted his escrow account.

Ocwen sent Hukic over ten notices of default during 2000 and 2001. On December 6, 2000, Ocwen wrote Hukic and told him that his loan had been transferred to Ocwen's Early Intervention Department for review and possible foreclosure. On January 11, 2001, Hukic's counsel wrote to Aurora. Counsel stated that Hukic had made timely payments to Aurora and was paying his property taxes directly, and also that Hukic had been unable to refinance his home due to negative information from Aurora on his credit reports. Counsel wrote a similar letter to Aurora later in the year.

On November 7, 2001, foreclosure proceedings began against Hukic in Illinois state court. On May 16, 2003, the state court wrote in an order that Ocwen had agreed "to accept reinstatement of monthly payments and the parties will continue to negotiate the escrow issue." A month later, in an order dated June 16, 2003, the state court dismissed the foreclosure proceedings and stated that Hukic had tendered proof of payment of real estate taxes for 2002 and the first installment of 2003. Hukic later prepared an application for a property tax refund and directed that the county pay a refund of the duplicate property tax payments to Ocwen.

On April 1, 2004, Hukic notified TransUnion, a credit reporting agency, that he disputed the status of his Ocwen account and asked TransUnion to investigate. One month later, TransUnion informed Hukic that the negative credit information reported by Ocwen had been deleted from his credit report. Hukic's later credit reports reflected an adverse account associated with Aurora but not with Ocwen.

Hukic filed suit against Aurora and Ocwen in Illinois state court on July 1, 2005. He maintained that he had been denied refinancing, loans and credit as a result of false information conveyed by Aurora and Ocwen to consumer reporting agencies. Aurora timely removed the case to federal court, and Hukic did not seek to remand the case. The district court granted the defendants' motion to dismiss seven of the counts alleged in the complaint. It later granted summary judgment to the defendants on the remaining claims for violation of the Fair Credit Reporting Act, breach of contract, and tortious interference with prospective economic advantage. Hukic appeals.

## II.  ANALYSIS

### A.  Subject Matter Jurisdiction

Hukic's first challenge is to our jurisdiction. He maintains that the notice of removal failed to establish diversity jurisdiction on its face, and, therefore, the federal court never had subject matter jurisdiction. Although Hukic did not raise this argument in the district court, it is always a federal court's responsibility to ensure it has jurisdiction, so we turn to that question first. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006). We analyze jurisdiction based on the events at the time the case is brought. *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567 (2004); *Olympia Exp., Inc. v. Linee Aeree Italiane, S.P.A.*, 509 F.3d 347, 349 (7th Cir. 2007). When a case is initially filed in state court and then removed to federal court, the time-of-filing rule means that we

analyze our jurisdiction at the time of removal, as that is when the case first appears in federal court. *Wisc. Dep't of Corrs. v. Schacht*, 524 U.S. 381, 391 (1998); *Tropp v. Western-Southern Life Ins. Co.*, 381 F.3d 591, 595 (7th Cir. 2004).

The federal removal statute authorizes a defendant to remove "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a); *see Wisc. Dep't of Corrs.*, 524 U.S. 381 at 386. One circumstance in which federal courts have original jurisdiction is when the lawsuit is between "citizens of different States" and the amount in controversy is over $75,000. 28 U.S.C. § 1332(a)(1). Paragraph four of Aurora's notice of removal invoked the federal court's jurisdiction on that basis.[1] The notice also stated that Hukic was an Illinois citizen and that Aurora "is a Delaware limited liability company and has its principal place of business in Colorado." But for diversity jurisdiction purposes, the citizenship of a limited liability company is the citizenship of each of its members. *Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007); *Hicklin Eng'g, L.C. v. Bartell*, 439 F.3d 346, 347 (7th Cir. 2006); *cf.* 28 U.S.C. § 1332(c)(1) (a *corporation* is a citizen of the states of its incorporation and principal place of business). The notice of removal therefore gave two pieces of irrelevant information about Aurora (the state of its principal place of business and that it was a Delaware company) while failing to provide the infor-

---

[1] Ocwen, a Florida citizen, had not been served at the time.

mation critical to determining its citizenship: the citizenship of its members.

Aurora has informed us on appeal that its sole member is Lehman Brothers Bank. At the time of removal, Lehman Brothers Bank (it has since been renamed) was a federally chartered savings association. *See Thomas*, 487 F.3d at 534 (assessing citizenship of limited liability company's members at time notice of removal filed). In contrast to state-chartered corporations, the citizenship of federally chartered corporations and savings associations has not always been straightforward. The Supreme Court held in *St. Louis & San Francisco Ry. Co. v. James*, 161 U.S. 545, 562 (1896), that a state-chartered corporation is a citizen of the state in which it was chartered for diversity jurisdiction purposes. The Court later held that a corporation chartered pursuant to an Act of Congress with activities in different states, on the other hand, was not a citizen of any state for diversity jurisdiction purposes. *Bankers Trust Co. v. Texas & Pacific Ry. Co.*, 241 U.S. 295, 309-10 (1916). In 1958, Congress enacted a provision now codified at 28 U.S.C. § 1332(c)(1) that made a corporation a citizen of the states of its incorporation and the location of its principal place of business. This provision meant that local companies could no longer bring suit in federal court on the basis of a corporate charter that had been obtained in another state. *See A.I. Trade Finance, Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995).

With *Bankers Trust* in the background, many courts concluded that 28 U.S.C. § 1332(c)(1) applied only to state corporations and not to federally chartered corporations or associations. The result for these courts was

that, unless a specific statutory provision dictated otherwise, a federally chartered savings association was not a citizen of any state, meaning it was not eligible for diversity jurisdiction; courts sometimes recognized an exception if activities were localized in one state. *See, e.g., Loyola Fed. Sav. Bank v. Fickling*, 58 F.3d 603, 606 (11th Cir. 1995); *Provident Nat'l Bank of Cal. Federal Savs. & Loan Ass'n*, 624 F. Supp. 858, 861 (E.D. Pa. 1985), *aff'd*, 819 F.2d 434 (3d Cir. 1987); *see also Feuchtwanger Corp. v. Lake Hiawatha Fed. Credit Union*, 272 F.2d 453, 455-56 (3d Cir. 1959) (discussing localization exception in case not governed by § 1332(c)).

Congress has now stepped in. After this case had been removed to federal court, Congress added a provision to the United States Code that states:

> In determining whether a Federal court has diversity jurisdiction over a case in which a Federal savings association is a party, the Federal savings association shall be considered to be a citizen only of the State in which such savings association has its home office.

12 U.S.C. § 1464(x). Although the provision became effective after the removal here, the defendants maintain that 12 U.S.C. § 1464(x) applies in this case with the result that Lehman was a citizen of Delaware, where it had its home office. Aurora points in support to the Supreme Court's pronouncement that "[i]ntervening statutes conferring or ousting jurisdiction" apply in pending cases, "whether or not jurisdiction lay when the

underlying conduct occurred or when the suit was filed." *Landgraf v. USI Film Products*, 511 U.S. 244, 274 (1994); *see First Midwest Bank v. Metabank,* No. 06-4114, 2007 WL 913893, at *3 (D.S.D. Mar. 23, 2007) (applying § 1464(x) to case pending at time of provision's passage). *But see World Savs. Bank, FSB v. Wu*, No. 08-00887, 2008 WL 1994881, at *2 (N.D. Cal. May 5, 2008) (declining to apply § 1464(x) retroactively and concluding court lacked subject matter jurisdiction).

There is another complication, though, which the parties did not discuss. That is the fact that even if § 1464(x) applies to cases where the removal occurred before the provision took effect, the provision's text says that it applies in cases where a federal savings association "is a party." A "party" is "[o]ne by or against whom a lawsuit is brought." *See U.S. ex rel Eisenstein v. City of New York*, 129 S. Ct. 2230, 2234 (2009)) (citing Black's Law Dictionary 1154 (8th ed. 2004)). In this case, Hukic sued Aurora (and Ocwen), not Lehman, so it is not clear that § 1464(x) controls Lehman's citizenship. *Cf. NetJets Aviation, Inc. v. LHC Commc'ns, LLC,* 537 F.3d 168, 176 (2d Cir. 2008) (stating members of a limited liability company are generally not liable for the entity's debts); *see also Creaciones Con Idea, S.A. de C.V. v. Mashreqbank PSC*, 232 F.3d 79, 82-83 (2d Cir. 2000) (finding use of "party" in 12 U.S.C. § 632 conferred federal jurisdiction only when federally chartered corporation was a party to banking suit and did not extend to predecessor of a party). Congress may have wanted a federal savings association to be considered the citizen of the state of its home office in any diversity jurisdiction determination,

and the heading of the section adding § 1464(x) does state "*Clarifying* citizenship of federal savings associations for federal court jurisdiction," albeit non-binding. Financial Services Regulatory Relief Act of 2006, Pub. L. No. 109-351, 120 Stat. 1966, 1974 (emphasis added). Perhaps Congress will see fit to clarify its clarification.

We can put all this aside, however, because we have jurisdiction for another reason. A federal court also has original jurisdiction over a cause that arises "under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Hukic's complaint has from the very beginning stated a claim under a federal statute, the FCRA, 15 U.S.C. § 1681. The federal court had original jurisdiction over the FCRA claim.

The next question is whether the presence of state-law claims in the complaint somehow means we lack subject matter jurisdiction. To answer that question we turn to 28 U.S.C. § 1367. Section 1367(a) provides in relevant part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action with such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

Section 1367(c) says that "district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a)" if certain conditions are met.

Section 1367(a), not section 1367(c), is the relevant provision for our jurisdictional question. The Supreme

Court has explained: "With respect to supplemental jurisdiction in particular, a federal court has subject-matter jurisdiction over specified state-law claims, which it may (or may not) choose to exercise." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 129 S. Ct. 1862, 1866 (2009). In contrast, "'the [district] court's exercise of its discretion under § 1367(c) is not a jurisdictional matter.'" *Id.* at 1867 (quoting 16 J. Moore et al., Moore's Federal Practice § 106.05[4], p. 106-27 (3d ed. 2009)). The notice of removal and attached complaint make clear that all of Hukic's claims arise out of the servicing of Hukic's mortgage loan by Aurora and Ocwen and the reports those entities made to credit reporting agencies, and the claims arise out of the same case or controversy. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966); *Okolie v. TransUnion LLC*, No. 99-CV-2687, 1999 WL 458165, at *1 (E.D.N.Y. June 30, 1999) (finding claims for FCRA, breach of contract, and defamation shared common nucleus of operative fact); *Wiggins v. Hitchens*, 853 F. Supp. 505, 514-15 (D.D.C. 1994) (concluding that FCRA, tortious interference with a contract, and conspiracy claims formed part of same "case or controversy").

Therefore, the federal court had jurisdiction over the claims in Hukic's complaint. We point out that this discussion likely would have been much shorter had the notice of removal also explicitly stated that § 1331 (along with § 1367) provided a basis for removal. For in addition to the subject matter jurisdiction requirement for removal, there is also the statutory requirement that the defendant file a notice of removal "containing a short and plain statement of the grounds for removal, together

with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action." 28 U.S.C. § 1446(a). We are sometimes unable to proceed if the notice of removal does not make the basis of federal jurisdiction clear, such as when there is an allegation in the notice that contains the parties' residence but not their domicile, as the latter is the critical information we need to determine whether we have jurisdiction based on diversity. *See Northern League, Inc. v. Gidney*, 558 F.3d 614, 614 (7th Cir. 2009) (per curiam) (finding that removal notice's allegation of residence and not domicile presented genuine jurisdictional problem); *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 653-54 (7th Cir. 1998) (granting motion to amend pleadings under 28 U.S.C. § 1653 to supply missing jurisdictional details).

Here, however, the basis of original jurisdiction was clear. The notice of removal states that the complaint alleged a claim under the FCRA and cited the pertinent United States Code provision, and the notice also stated that such a claim could be brought in federal or state court. The notice also states that all the claims arose out of Aurora and Ocwen's servicing of Hukic's loan, and the attached complaint confirmed that the state-law claims were part of the same case or controversy as the FCRA claim. And, unlike in *Gavin v. AT&T Corp.*, 464 F.3d 634 (7th Cir. 2006), where the defendant never argued an alternate basis of federal jurisdiction even when pressed, the defendants here affirmatively argued to us—the first time that jurisdiction was raised as an issue—that federal question jurisdiction exists. We are satisfied that we have jurisdiction, and we will proceed to the merits.

B.   Procedural Arguments

1.   Effect of Illinois State Court Foreclosure Action

In the first of several procedural arguments, Hukic argues that the district court failed to give the state court foreclosure judgment full faith and credit. *See* 28 U.S.C. § 1738; *Licari v. City of Chicago*, 298 F.3d 664, 666 (7th Cir. 2002) (federal courts must give state court judgments same preclusive effect they would have in state court). Aurora and Ocwen stipulated that the foreclosure judgment was entitled to full faith and credit, and the district court orally granted a motion to afford the judgment full faith and credit. Although it later denied a formal motion as moot, that denial does not suggest that the district court failed to afford the foreclosure judgment its proper credit, and we find nothing in the district court's decision indicating it failed to do so.

Hukic's true objection seems to be to the interpretation the district court gave to the state court judgment. Hukic maintains that the foreclosure judgment meant that Aurora and Ocwen should have been collaterally estopped from raising any arguments in this case concerning his performance under the terms of the mortgage. The state court's order reflects that resolution of the foreclosure action was an involuntary dismissal pursuant to Illinois Supreme Court Rule 273, and Hukic emphasizes that the rule provides that unless specified otherwise, "an involuntary dismissal of an action, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join an indispensable party, operates as an adjudication upon the merits."

It is true that an adjudication on the merits is one of the prerequisites for collateral estoppel. *In re A.W.*, 896 N.E.2d 316, 321 (Ill. 2008); *see also Barbers, Hairstyling for Men & Women, Inc. v. Bishop*, 132 F.3d 1203, 1206 (7th Cir. 1997). It is not the only one, however. Collateral estoppel only "bars relitigation of an issue already decided in a prior case." *In re A.W.*, 896 N.E.2d at 321 (quoting *People v. Tenner*, 794 N.E.2d 238, 248 (Ill. 2002)). That is, the issue decided in the prior adjudication must be identical to the one presented in the suit in question for collateral estoppel to apply. *Id.; see also Boelkes v. Harlem Consolidated Sch. Dist. No. 122*, 842 N.E.2d 790, 795 (Ill. App. Ct. 2006). Collateral estoppel does not apply here. The foreclosure judgment bears no indication that the issue of Hukic's compliance with his obligations under the mortgage had been litigated and decided in his favor. Instead, the substance of the June 16, 2003 state court order dismissing the foreclosure action states only that Hukic had "tender[ed] proof of payment of Cook Co. Real Estate Taxes for Tax year 2002 and first installment of 2003." If that statement is relevant here at all, it is to suggest that prior to that time, when Aurora and Ocwen were providing information to credit reporting agencies, Hukic had not submitted proof of his payment of his property taxes. The May 16, 2003 state court order also does not help Hukic. It stated that Ocwen agreed "to accept reinstatement of monthly payments." The Illinois statute concerning reinstatement provides that in any foreclosure of a mortgage which has become due "through acceleration because of a default under the mortgage," a mortgagor may reinstate the mortgage, 735 Ill. Comp. Stat. 5/15-1602, and

"[r]einstatement is effected by curing all defaults then existing," *id.* The use of "reinstatement" in the May order therefore suggests a prior default, and an order stating that Ocwen had agreed to reinstatement does not constitute a determination that Hukic had complied with the terms of his mortgage agreement prior to that date.

Finally, the district court's interpretation of the state court judgment did not violate the *Rooker-Feldman* doctrine as Hukic suggests. The Supreme Court has emphasized the narrowness of the doctrine, stating it is "confined to cases . . . brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). In short, the doctrine prevents a party from effectively trying to appeal a state-court decision in a federal district or circuit court. *See Lance v. Dennis*, 546 U.S. 459, 463 (2006). No one in this case is attempting to challenge the rulings in the state court foreclosure proceeding. Aurora and Ocwen are not the plaintiffs in the federal suit, nor do they challenge the foreclosure judgment or seek to resume foreclosure proceedings in this suit. The *Rooker-Feldman* doctrine has not been violated.

### 2.   Denial of Leave to File Second Amended Complaint

We turn next to Hukic's contention that the district court abused its discretion when it denied him leave to

file a second amended complaint. Although leave to amend should be freely given, Fed. R. Civ. P. 15(a), that does not mean it must always be given. "[D]istrict courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008).

Several of those circumstances apply here. Hukic did not seek leave to file his second amended complaint until three days before the close of fact discovery and one day after Hukic's deposition. When he did so, he sought to add eleven new causes of action against the existing defendants as well to add a third defendant.[2] Yet discovery on the other claims, including numerous depositions, had already taken place with only the initial claims in mind. *See Ferguson v. Roberts*, 11 F.3d 696, 706 (7th Cir. 1993) (upholding denial of leave to file amended complaint where proposed complaint "contained new complex and serious charges which would undoubtedly require additional discovery for the defendants to rebut") (internal quotation marks omitted).

---

[2] Hukic sought to add claims for violation of the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, et seq.; violation of the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1691, et seq.; fraudulent concealment; unjust enrichment; violation of the duty of good faith and fair dealing; conversion; negligence; intentional or negligent misrepresentation; fraud; violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, et seq.; and civil conspiracy.

Moreover, the district court did not abuse its discretion when it ruled that the reason Hukic gave for requesting leave late in the process did not justify granting leave so late in the game. Hukic says he learned of other pending lawsuits against Ocwen that involved mortgage servicing issues shortly before he requested leave to amend, and he said he only discovered the other suits when comment logs he received from the defendants during discovery raised questions. But the existence of lawsuits against Ocwen was publicly available information, available long before he sought leave to amend. The principal case to which he points, for example, had been pending against Ocwen since 2003. Therefore, we find no abuse of discretion in the district court's decision to deny leave to file a second amended complaint.

### C.   Substantive Arguments

Hukic argues that material issues of fact remain that preclude summary judgment on his breach of contract, tortious interference with a credit expectancy, and FCRA claims. We review the grant of summary judgment de novo, with the familiar standard that summary judgment should be granted if there is no genuine issue of material fact and the record demonstrates that the moving party is entitled to a judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Holmes v. Potter*, 552 F.3d 536, 538 (7th Cir. 2008). Hukic also challenges the dismissal of his claims for defamation and intentional infliction of emotional distress.

1.  Breach of Contract and Tortious Interference
    Claims

Summary judgment was proper on the breach of contract and tortious interference claims because there were no genuine issues of material fact precluding its entry. Even if we disregard the $200 shortfall that resulted when the money order for $1,335 was processed only for $1,135, Hukic still failed to comply with his contractual requirement that he submit proof he was paying his property taxes directly to the county and that he was buying his own insurance. *See Catania v. Local 4250/5050 of Commonwealth Workers of Am.*, 834 N.E.2d 966, 971 (Ill. App. Ct. 2005) (stating plaintiff must demonstrate its performance with contract's requirements to succeed on breach of contract claim). The mortgage agreement provided that Hukic could pay the taxes and insurance premiums directly, but only if he "promptly furnish[ed]" receipts evidencing his payments.

Despite repeated requests, Hukic did not furnish evidence that he had been paying his taxes directly to the county until his foreclosure proceeding. Nor did he submit evidence that he was paying insurance premiums on his own. Hukic does not contest that he was repeatedly advised that he was behind on his mortgage and that he was told how to cure the deficiency. Because he did not do so, the servicers continued to make the tax and insurance payments, which the mortgage agreement allowed them to do. The result, though, was that Hukic was in default on his mortgage and not complying with his contractual requirements.

Although Hukic maintains issues of fact exist as to, for example, the nature of the relationship between the parties and whether Ocwen was on notice of Hukic's damages, none creates a genuine issue of material fact as to whether Hukic was in default. Hukic's Uniform Commercial Code argument also fails to address the breach of contract associated with the tax and insurance funds in the escrow account. He argues that the operation of Uniform Commercial Code Section 3-310, Ill. Comp. Stat. 5/3-310, meant that his obligations were discharged when he gave a money order in the amount of $1,335 to Life Savings Bank. But that does not address the larger breach related to the tax and insurance amounts. Summary judgment was proper on his breach of contract claim.

Summary judgment was similarly proper on the tortious interference claim. A tortious interference with prospective economic advantage claim requires, among other things, an intentional and unjustified interference by the defendant. *Voyles v. Sandia Mortgage Corp.*, 751 N.E.2d 1126, 1133 (Ill. 2001). In *Voyles*, the Supreme Court of Illinois held that a tortious interference claim premised on allegedly inaccurate credit reporting cannot succeed when a mortgage servicer truthfully reports a loan as in foreclosure, even when the underlying events leading to the foreclosure are disputed and the loan is later reinstated. *Id.* at 1133-34. Similarly here, Hukic was in breach of the terms of his loan, and it was not inaccurate to tell credit reporting agencies that Hukic had defaulted on his mortgage. Therefore, summary judgment was proper on the tortious interference claim as well.

2.   Fair Credit Reporting Act Claim

Hukic also contests the district court's grant of summary judgment to Aurora and Ocwen on his FCRA claim. In addition to imposing obligations on consumer reporting agencies, the FCRA contains requirements for entities such as Aurora and Ocwen that furnish information to those agencies. For example, an entity cannot furnish information if it knows or has reasonable cause to know the information is inaccurate. 15 U.S.C. § 1681s-2(a)(1)(A). Because Hukic had not complied with his obligations under the mortgage agreement regarding the amounts Aurora and Ocwen paid for taxes and insurance, Aurora and Ocwen were not furnishing false information when they informed consumer reporting agencies that he was behind on his payments.

In 15 U.S.C. § 1681s-2(b)(1), the FCRA mandates that "[a]fter receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided" to a consumer reporting agency, the furnisher must conduct an investigation regarding the disputed information and report the results to the agency. If the investigation concludes that a disputed item is inaccurate or cannot be verified, the furnisher must promptly modify, delete, or block the reporting of that information. 15 U.S.C. § 1681s-2(b)(1)(E).

On April 1, 2004, Hukic sent a letter to the credit reporting agency TransUnion that disputed the status of his Ocwen account, and he asked Trans Union to investigate. TransUnion conveyed information to Ocwen regarding

Hukic's dispute in accordance with its obligation under 15 U.S.C. § 1681i(a)(1). Ocwen removed the negative information it reported on or before May 1, 2004. Ocwen therefore complied with its obligations under the FCRA.

Although Ocwen removed Hukic's negative information after its investigation, Aurora continued to report that Hukic's account with it had been delinquent. Hukic never notified any credit reporting agencies that he disputed the status of his Aurora account. He argued to the district court, however, that Ocwen had a duty to inform Aurora that items on Hukic's credit report were disputed. Although Hukic maintained that Ocwen was Aurora's "sub-agent," there is no evidence in the record that Aurora hired Ocwen to assist it in transacting its affairs. *See AYH Holdings, Inc. v. Avreco, Inc.*, 826 N.E.2d 1111, 1125-26 (Ill. App. Ct. 2005). He also argued that Ocwen had "constructive knowledge" that Aurora reported Hukic as late after Ocwen received access to Hukic's credit report, but he does not point to any provision in the FCRA that would require an information furnisher to investigate information reported by other entities. Summary judgment was therefore proper on Hukic's claim under 15 U.S.C. § 1681s-2(b) as well.

### 3. Defamation Claim

Hukic also appeals the district court's grant of the defendants' motion to dismiss his claims for defamation and intentional infliction of emotional distress. We review the grant of a motion to dismiss for failure to state

a claim upon which relief can be granted de novo. *Chaudhry v. Nucor-Steel Indiana*, 546 F.3d 832, 836 (7th Cir. 2008). We accept the complaint's well-pleaded allegations as true and draw all favorable inferences in the plaintiff's favor. *Id.*

We first address the defamation count, which was premised on reports Aurora and Ocwen made to credit reporting agencies that his payments were past due. Hukic's complaint alleged these reports were false and that he had been denied refinancing, loans and credit as a result. The FCRA bars defamation suits against entities that furnish information to consumer reporting agencies based on information such as that provided by Aurora and Ocwen "except as to false information furnished with malice or willful intent to injure such consumer." 15 U.S.C. § 1681(h). Because Hukic alleged in his complaint that the defendants acted with malice, the district court declined to grant the defendants' motion to dismiss on preemption grounds. Instead, it granted the motion to dismiss the defamation claim for failure to file suit within the statute of limitations. Hukic appeals that determination.

Our consideration of whether the statute of limitations barred this state-law claim requires us to act how we think the Supreme Court of Illinois would if faced with this question. *Rodrigue v. Olin Employees Credit Union*, 406 F.3d 434, 442 (7th Cir. 2005). Illinois defamation actions have a one-year statute of limitations. 735 Ill. Comp. Stat. 5/13-201; *Bryson v. News Am. Pub'ns, Inc.*, 672 N.E.2d 1207, 1222 (Ill. 1996); *Rowan v. Novotny*, 510

N.E.2d 1111, 1113 (Ill. App. Ct. 1987). The statute of limitations on a defamation count in Illinois generally begins to run on the date of publication of the allegedly defamatory material. *Bryson*, 672 N.E.2d at 1222; *Tom Olesker's Exciting World of Fashion, Inc. v. Dun & Bradsheet, Inc.*, 334 N.E.2d 160, 161 (Ill. 1975). Under certain circumstances, namely when a publication was "hidden, inherently undiscoverable, or inherently unknowable," Illinois courts apply the "discovery rule" such that the statute of limitations does not accrue until the plaintiff knew or should have known of the defamatory report. *Blair v. Nev. Landing P'ship*, 859 N.E.2d 1188, 1195 (Ill. App. Ct. 2006); *see Tom Olesker*'s, 334 N.E.2d at 164 (cause of action against credit reporting agency that prohibited distribution of reports to non-subscribers did not accrue until plaintiff knew of allegedly defamatory report). In this case, the district court concluded that Hukic knew about the defendants' reports to credit reporting agencies at the latest in January 2001 when Hukic's counsel sent a letter to Aurora questioning the report. Because Hukic filed suit more than a year later, the district court ruled that Hukic's defamation claim was time-barred.

Although the defendants urge us to apply this analysis on appeal as well, the statute of limitations analysis in this case involves more than an inquiry into whether the discovery rule should be applied to a single allegedly defamatory publication. Hukic's complaint alleged that Aurora continued to make false statements to consumer reporting agencies as of the complaint filing date. That raises the question of whether the Supreme Court of Illinois would conclude that the statute of limitations

barred even the false reports that Hukic alleged had occurred within the year preceding his lawsuit's filing.

The parties have framed this as a question of whether to apply the "continuing violation rule," whereby the statute of limitations on a tort that involves a continuing injury does not begin to run until the date of the last injury or last tortious act. *See, e.g., Feltmeier v. Feltmeier*, 798 N.E.2d 75, 85 (Ill. 2003); *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 191 (Ill. 2002). We examined the Supreme Court of Illinois's treatment of the "continuing violation rule" in *Rodrigue* and concluded that Illinois does not apply the continuing violation rule to "a series of discrete acts, each of which is independently actionable, even if those acts form an overall pattern of wrongdoing." *See Rodrigue*, 406 F.3d at 443; *cf. Feltmeier*, 798 N.E.2d at 84-88 (applying continuing violation rule to abused wife's intentional infliction of emotional distress claim alleging that husband's abuse took place for more than eleven years); *Cunningham v. Huffman*, 609 N.E.2d 321, 326 (Ill. 1993) (applying rule to medical malpractice claim alleging that injury resulted from continuous unbroken course of negligent treatment); *Kidney Cancer Ass'n v. North Shore Cmty. Bank and Trust Co.*, 869 N.E.2d 186, 194 (Ill. App. Ct. 2007) (following *Rodrigue* and holding that cashing of checks over a period of years did not constitute a continuing violation).

We do not think that Illinois would apply the continuing violation rule in this case. Hukic's claim did not depend upon a longstanding or unbroken course of

activity as in the spousal abuse or medical malpractice claims in *Feltmeier* and *Cunningham*, where Illinois has applied the continuing violation rule. Instead, the multiple reports Aurora and Ocwen made to the consumer reporting agencies constituted separate, discrete acts, even one of which would have given rise to a cause of action under Hukic's theory. As such, the continuing violation rule does not apply.

The question instead seems to be whether Illinois would apply the "single publication rule." "It is the general rule that each communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises." Restatement (Second) of Torts § 577A cmt. a (1977); *see also Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 n.3 (1984) (quoting comment a to Restatement). The exception to this general rule is what is known as the "single publication rule." Illinois has enacted the Uniform Single Publication Act, pursuant to which a person has only a single cause of action for any defamation

> founded upon any single publication or exhibition or utterance, such as any one edition of a newspaper or book or magazine or any one presentation to an audience or any one broadcast over radio or television or any one exhibition of a motion picture.

740 Ill. Comp. Stat. 165/1; *see Schaffer v. Zekman*, 554 N.E.2d 988, 993 n.2 (Ill. App. Ct. 1990) (stating that Uniform Single Publication Act applies to defamation

claims). When the statute applies, the cause of action accrues on the single date of first publication. *Blair*, 859 N.E.2d at 1193; *Winrod v. MacFadden Publ'ns*, 187 F.2d 180, 183 (7th Cir. 1951). By arguing that the defamation cause of action accrued only in January 2001, Aurora and Ocwen seem to be taking the position that their later communications to consumer reporting agencies would fall under the single publication rule.

The single publication rule "is applied in cases where the same communication is heard at the same time by two or more persons. In order to avoid multiplicity of actions and undue harassment of the defendant by repeated suits by new individuals, as well as excessive damages that might have been recovered in numerous separate suits, the communication to the entire group is treated as one publication, giving rise to only one cause of action." Restatement (Second) of Torts § 577A cmt. b (1977); *see Founding Church of Scientology of Wash., D.C. v. Am. Med. Ass'n*, 377 N.E.2d 158, 160 (Ill. App. Ct. 1978).

Neither the Supreme Court of Illinois nor the Illinois Appellate Court has addressed the impact of the Uniform Single Publication Act on claims premised upon information given to or provided by consumer reporting agencies. However, several other courts have discussed the single publication rule in the credit reporting context. The Ninth Circuit recently stated that with respect to release of personal credit reports by agencies that compile credit information, "it has been widely accepted that the transmission or publication of the information does not warrant application of the

single publication rule, and each transmission or publication is actionable." *Oja v. U.S. Army Corps of Eng'rs*, 440 F.3d 1122, 1133 (9th Cir. 2006). Many other courts have declined to apply the single publication rule as well. *See Lawrence v. TransUnion LLC*, 296 F. Supp. 2d 582, 587-88 (E.D. Pa. 2003); *Jaramillo v. Experian Info. Solutions, Inc.*, 155 F. Supp. 2d 356, 360-61 (E.D. Pa. 2001); *Musto v. Bell South Telecomms. Corp.*, 748 So.2d 296 (Fla. App. Ct. 1999); *Schneider v. United Airlines, Inc.*, 256 Cal. Rptr. 71 (Ct. App. 1989); *see also Hyde v. Hibernia Nat'l Bank*, 861 F.2d 446, 450 (5th Cir. 1988) (declining to apply single publication rule in FCRA action*); Larson v. Ford Credit*, No. 06-CV-1811, 2007 WL 1875989, at *2-4 (D. Minn. June 28, 2007) (declining to apply single publication rule in FCRA claim and collecting cases in FCRA context). Some courts have applied the single publication rule in the credit reporting context, reasoning that no new publication occurs when the same, or essentially the same, credit information is released on multiple occasions. *See David J. Gold, P.C. v. Berkin*, No. 00 CV 7940, 2001 WL 121940 (S.D.N.Y. Feb. 13, 2001); *Ferber v. Citicorp Mortgage*, 1996 WL 46874, at *6 (S.D.N.Y. Feb. 5, 1996); *Milner v. N.Y. State Higher Educ. Servs. Corp.*, 777 N.Y.S.2d 604, 608 (Ct. Cl. 2004).

We think that if this case were before the Supreme Court of Illinois, it would not apply the single publication rule. For one, the concern about a multiplicity of lawsuits is not present here as it is in the mass publication context. *Cf. Winrod v. Time, Inc.*, 78 N.E.2d 708, 714 (Ill. App. Ct. 1948) (concluding that rule was based principally on the practical reality that without it, a multitude of suits would result from large distributions of published

matter and purpose of statute of limitations would be eviscerated). "Credit information is confidential; dissemination is limited; and it is easy to determine exactly when and to whom the information was disseminated." *Larson*, 2007 WL 1875989, at *4. Another reason for the single publication rule in the mass newspaper or magazine publication context is that even though numerous copies result from an initial publication, "no conscious intent arises until the defendant consciously as a second edition republishes the article." *Winrod*, 78 N.E.2d at 714; *see also Dubinsky v. United Airlines Master Executive Council*, 708 N.E.2d 441, 445 (Ill. App. Ct. 1999). Here, in contrast, the defendants affirmatively gave information to consumer reporting agencies on numerous, separate occasions after January 2001.

Moreover, although some courts reason that no new publication occurs when an entity later transmits the same credit information, whether information in a later publication is identical is not dispositive under the Restatement. "[T]he single publication rule . . . does not include separate aggregate publications on different occasions. Thus if the same defamatory statement is published in the morning and evening editions of a newspaper, each edition is a separate single publication and there are two causes of action" since the publication reaches a new group each time. Restatement (Second) of Torts § 577A cmt. d (1977); *see Weber v. Cueto*, 624 N.E.2d 442 (Ill. App. Ct. 1993). And here, in any event, the information conveyed did not stay the same. The credit reports attached to Hukic's complaint reflect that information reported to the consumer reporting agencies

changed over the time, as the number of times payments were past due changed, the foreclosure proceeding appeared later, and Ocwen ceased to report negative information by the end. Therefore, we do not think that the Supreme Court of Illinois would apply the single publication rule in this case.

A conclusion that the single publication rule does not apply means that reports Aurora made to consumer reporting agencies within a year prior to the lawsuit's filing would not be barred simply because Hukic knew that Aurora had previously made other reports to those agencies.[3] In this case, however, that does not mean that Hukic receives a remand for further proceedings. Hukic's claim is not one of defamation *per se* under Illinois law. *See also Whitby v. Associates Disc. Corp.*, 207 N.E.2d 482, 485 (Ill. App. Ct. 1965) (statements to credit bureau did not constitute defamation *per se* and plaintiff needed to establish special damages to recover). When a defamation claim is one for defamation *per quod* like this one instead of one for defamation *per se*, a plaintiff must show special damages, i.e., actual damages of a pecuniary nature, to succeed. *See id.; Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 882 N.E.2d 1011, 1018 (Ill. 2008).

In Illinois courts and in federal courts sitting in diversity, special damages must be specifically pled when

---

[3] The complaint does not allege that Ocwen conveyed any false information to credit reporting agencies within the year preceding the lawsuit's filing.

a complaint alleges a defamation *per quod* claim. Fed. R. Civ. P. 9(g); *Lott v. Levitt*, 556 F.3d 564, 570 (7th Cir. 2009); *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003). Hukic's complaint alleges that he had certain credit applications and loans denied from 2001 through 2003 because of false statements Aurora and Ocwen made to consumer reporting agencies. The last of these adverse events alleged in the complaint occurred on December 4, 2003, well outside the limitations period that began on July 1, 2004 (Hukic filed his suit on July 1, 2005). In other words, even if reports made to consumer reporting agencies within the year preceding a suit's filing can be actionable, they are not in this case because the complaint does not allege any harm that resulted from those particular transmissions. We therefore uphold the dismissal of the defamation claim. We note also that Hukic stated in his deposition that he did not believe Aurora and Ocwen intentionally made false reports and that he instead thought their actions were simply a mistake, further dooming his defamation claim since he needed to show that the reports were made with malice or willful intent. *See* 15 U.S.C. § 1681(h); *Johnson v. Hondo, Inc.*, 125 F.3d 408, 419 (7th Cir. 1997) (declining to remand even though district court incorrectly granted motion to dismiss because remand would be futile).

### 4. Intentional Infliction of Emotional Distress Claim

Finally, we briefly address the dismissal of Hukic's intentional infliction of emotional distress claim. An

intentional infliction of emotional distress claim in Illinois requires that the defendants' conduct be "extreme and outrageous." *Kolegas v. Heftel Broad Corp.*, 607 N.E.2d 201, 211 (Ill. 1992). To meet this standard, the defendant's conduct "must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Id.; see also Lewis v. School Dist. #70*, 523 F.3d 730, 747 (7th Cir. 2008). Hukic maintains that Aurora failed to apply his monthly mortgage payments properly and incorrectly reported his loan as delinquent, but none of the conduct alleged in the complaint or adduced during discovery rises to the level of "extreme and outrageous" conduct that would be sufficient to support a claim under Illinois law. As we noted earlier, even Hukic thought the information had been conveyed to credit reporting agencies only by mistake. *See also Public Fin. Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976) (finding collection methods that included going to plaintiff's residence did not rise to the level of extreme and outrageous conduct). Hukic cannot succeed on this claim either.

## III. CONCLUSION

The judgment of the district court is AFFIRMED.