**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 27, 2021
Decided June 16, 2021

*Before*

DIANE S. SYKES, *Chief Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

No. 20-2978

| | |
|---|---|
| FIDEL SALGADO,<br>*Plaintiff-Appellant*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 18-cv-8119 |
| GRAHAM ENTERPRISE INC.,<br>*Defendant-Appellee*. | Sara L. Ellis,<br>*Judge*. |

**ORDER**

In the three years leading up to his discharge by Graham Enterprise Inc., Fidel Salgado endured derogatory comments about his Mexican heritage from his supervisor. After he was fired, Salgado sued the company under Title VII of the Civil Rights Act of 1964 for national-origin discrimination. The district court entered summary judgment for Graham Enterprise, and we affirm.

**I**

For 25 years, Salgado worked for Graham Enterprise, a company that owns and operates gas stations in and around Chicago. The company's owner, Patrick Graham, hired Salgado in 1993 as a cashier at one of the stations. Two years later, Salgado was promoted from cashier to general manager, a position he held until his discharge in 2018.

Salgado's complaints of discrimination date back to 2015, when Clifford Scott, a district manager, became his supervisor. Salgado recalled that Scott made several derogatory comments about his heritage. Scott asked him, for instance, why he did not take the day off for Cinco de Mayo. And during meetings at Graham Enterprise's corporate office, Scott commented to him, "[O]h, sorry, there's no Mexican food. We didn't order no Mexican." Scott allegedly also mocked Salgado while in the bathroom by observing, "You know, you Mexicans have a small pecker."

While under Scott's supervision, Salgado's misconduct at work resulted in three "final" warnings. First, in April 2016, Salgado received a warning from Scott and Keyur Bhatt, the company's human resources director, in response to an incident that occurred the previous month at the Skokie Citgo station. Video footage from that day shows a woman who did not work at the station entering the back office with Salgado. The video then shows Salgado moving a cardboard box in front of the surveillance camera attached to or near the office ceiling. Bhatt believed that the two then engaged in sexual activity—an allegation Salgado denies. After being confronted with the video surveillance, Salgado signed the written warning and admitted to knowing that it was against company policy to take nonemployees into a gas station's back office.

The second warning to Salgado came in May 2016. It was then that he received a two-week disciplinary suspension and probationary demotion for two incidents. First, Salgado left his assigned store with a woman and her children while still on the clock. Upon returning about 90 minutes later, Salgado continued to socialize until clocking out. The second incident occurred just days later. Salgado returned to work an hour late from an approved absence, and he was again found to have obstructed the surveillance camera in the back office while accompanied by a woman who did not work for Graham Enterprise. Bhatt, Scott, and Brian Kappel, the operations manager, prepared this second warning, and Salgado signed it, acknowledging that he understood his job was in "serious jeopardy." After his suspension, Graham Enterprise reassigned Salgado to a customer service representative's role, though the company later reinstated him as general manager on Scott's recommendation.

Salgado received his third warning more than a year later in November 2017. Company management discovered that he had been clocking in and out of the Forest View gas station for more than eight months despite being assigned to another location. Salgado signed the warning, acknowledging not only that he had punched in and out at unauthorized sites, but also that falsifying time was grounds for dismissal. Indeed, Graham Enterprise had fired another general manager for falsifying time, and Bhatt recommended that the company follow suit with Salgado. Patrick Graham overrode Bhatt's recommendation, however, wanting to give Salgado one last chance.

That last chance proved short lived. Graham Enterprise terminated Salgado in March 2018. The final straw came after the company's bank reported cash shortages of $20 each with seven consecutive deposits from the Rock 'n' Roll gas station in Chicago, where Salgado worked. As general manager, Salgado shouldered responsibility for counting and depositing money each day. Scott investigated the missing money: he reviewed the deposit slips and confirmed from the Rock 'n' Roll station's surveillance footage (which no longer exists) that Salgado was the only employee who had handled the deposits. When Salgado could not explain the discrepancies, Graham Enterprise fired him for failing to protect company assets. All employees up the chain of command, including Scott, Bhatt, Kappel, and Graham, participated in and agreed with the decision.

Salgado sued Graham Enterprise for discrimination based on his national origin and a hostile work environment in violation of Title VII. At the pleading stage, the district court dismissed without prejudice the hostile-work-environment claim for failure to state a claim. Discovery ensued, and in time Graham Enterprise moved for summary judgment. For his part, Salgado responded that Scott's derogatory comments created a genuine factual dispute over whether Scott's discriminatory animus tainted the decision to fire him. Salgado also sought leave to amend his complaint to add a Title VII retaliation claim and a state-law spoliation-of-evidence claim based on the company's failure to preserve the surveillance videos from the Rock 'n' Roll station.

The district court granted Graham Enterprise's motion, concluding that Salgado had not raised a question of fact over the role that national origin played in his firing. The only evidence that Salgado presented to support his claim included Scott's derogatory comments about his Mexican heritage, but Salgado failed to specify when Scott made those comments and did not connect the comments to his discharge. Further, Salgado had not raised any fact question to suggest pretext in Graham Enterprise's proffered reason for firing him—the discrepancies in the bank deposits after he already had received three warnings. The court also denied Salgado's request to

amend his complaint, explaining that the proposed retaliation claim would be futile and any spoliation claim would be untimely.

## II

Before turning to the merits, we consider a concern raised by Graham Enterprise over our appellate jurisdiction. In light of the district court's failure to enter a final judgment under Federal Rule of Civil Procedure 54(b), Graham Enterprise worries that Salgado could seek to amend his hostile-work-environment claim, which the district court dismissed without prejudice at the pleading stage. That concern is unfounded. "The true test for determining finality under 28 U.S.C. § 1291 is not the adequacy of the judgment, but whether the district court has finished with the case." *Hernandez v. Dart*, 814 F.3d 836, 841 (7th Cir. 2016) (cleaned up). Here, the court signaled that it was done with the case when it wrote in its final order: "The Court enters judgment for Graham Enterprise on Salgado's complaint and terminates this case." Because the district court's action makes clear that it was finished with the case, our jurisdiction is secure.

## III

As for the merits, the record lacks evidence supporting Salgado's only claim, his contention that Graham Enterprise fired him because of his national origin. He insists the claim should proceed to trial because, as he sees the evidence, there remains a material factual dispute about whether Scott's discriminatory animus—reflected in the derogatory comments about Salgado's Mexican heritage—tainted the company's disciplinary investigations and ultimate decision to fire him. Salgado contends that Scott initiated or influenced the investigation against him, so a reasonable jury could infer that his termination of employment stemmed from Scott's hostility toward his national origin.

The record shows otherwise. Scott's remarks, without more, do not create a triable fact issue over the role that Salgado's national origin played in his firing. For biased comments to reflect discriminatory motive, they must have been made by the decisionmaker around the time of, and in reference to, the adverse employment decision. See *Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 885 (7th Cir. 2016). Although Scott was among the decisionmakers in Salgado's discharge, Salgado could not remember when Scott made the derogatory comments, and he cannot trace his discharge to any of them. Even more, Salgado has not called into question the objective evidence that triggered his disciplinary actions and his ultimate termination of employment—another employee's report that Salgado had brought an unauthorized

nonemployee into the back office, the records showing that Salgado clocked in and out at unauthorized locations, and reports from the company's bank about the missing cash from the seven deposits. See *Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010) (explaining that a superior's stray remarks were insufficient to support an inference of discrimination when an investigation initiated by a superior revealed evidence of plaintiff's misconduct).

Salgado further contends that a fact question remains over the honesty of Graham Enterprise's stated reason for firing him—the disappearance of the deposit money. Salgado asks us to infer pretext from the incongruity between the company's disciplinary actions against him and his successful 25-year career and progression to general manager—steps that, he contends, reflect the company's satisfaction with his job performance. Here, too, we disagree.

No reasonable jury could conclude that Graham Enterprise's proffered reason for firing Salgado was untruthful, as is needed to establish pretext. See *Formella v. Brennan*, 817 F.3d 503, 513–14 (7th Cir. 2016). At the time of the incident involving cash shortfalls with the bank deposits, Salgado already had received three written warnings. He has not pointed to any record evidence calling into question the reasonableness of the company's investigation of the missing cash or its conclusion that, as the person who counted the money every day, Salgado bore the responsibility for ensuring an accurate and complete accounting of cash receipts and related deposits from the Rock 'n' Roll station. As for the length of his tenure, Salgado's "belief that he was performing his job adequately is not relevant to the question of whether [the company] believed it had a legitimate, non-discriminatory basis to terminate him." *Lauth v. Covance, Inc.*, 863 F.3d 708, 715–16 (7th Cir. 2017).

**IV**

Salgado's remaining arguments also fail. He asserts that the district court inappropriately resolved a material fact issue against him by concluding from the Skokie Citgo station videotape that he obstructed the camera in the back office intentionally—the incident that led to his first warning. But any dispute over Salgado's state of mind regarding his intent to obstruct the camera is immaterial. Regardless of his intent, no one disputes that the video showed Salgado violating company rules by bringing a woman who did not work at the station into the back office. The district court grounded it summary judgment analysis in Salgado's well-documented history of violating company policies, culminating in the missing cash from the bank deposits.

Nor do we see any abuse of discretion in the district court's denial of Salgado's request to amend his complaint to add two claims. Salgado first sought leave to amend his complaint during the summary judgment phase, when he asked the court for permission to add a Title VII retaliation claim based on Graham's deposition testimony that he likely would not rehire Salgado. Salgado interpreted this statement to mean that Graham intended to retaliate against him for suing the company. But the district court reasonably viewed the proposed claim as futile because Salgado cannot show that he suffered an adverse employment action. For starters, Graham never said he would not rehire Salgado. Rather, Graham testified only that he would not be comfortable making that decision without input from his management team. And nothing in the record suggests that Salgado ever applied for reemployment or that the company's discriminatory practices deterred him from doing so. See *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 558 (7th Cir. 2004).

Salgado also sought leave to add a state-law spoliation claim regarding the surveillance video that no longer exists from the Rock 'n' Roll station. Illinois law does not recognize spoliation of evidence as an independent, freestanding cause of action, but rather "an action for negligent spoliation can be stated under existing negligence law." *Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267, 269–70 (Ill. 1995). Regardless, the district court appropriately exercised its discretion by denying the request as untimely. Salgado knew about the video footage long before bringing this action—indeed, the final warnings and discharge decision referred to the footage—and his proposal simply came too "late in the game." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 432 (7th Cir. 2009).

AFFIRMED