In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2506

UNITED STATES OF AMERICA,

*Plaintiff,*

*v.*

SANFORD-BROWN, LIMITED, *et al.*,

*Defendants-Appellees.*

APPEAL OF: BRENT M. NELSON

Appeal from the United States District Court for the
Eastern District of Wisconsin
No. 12-cv-00775— **J. P. Stadtmueller**, *Judge.*

ARGUED JANUARY 8, 2015 — DECIDED JUNE 8, 2015

Before BAUER, MANION, and ROVNER, *Circuit Judges.*

MANION, *Circuit Judge.* Brent Nelson spent six months as
the Director of Education at Sanford-Brown College, a for-
profit educational institution located in Milwaukee, Wisconsin.
After he resigned, Nelson initiated this suit under the False
Claims Act. Based on its receipt of federal subsidies from the

U.S. Department of Education, Nelson alleges that the college's recruiting and retention practices resulted in the transmission of thousands of false claims to the government, potentially subjecting the college and its corporate parent to hundreds of millions of dollars in liability. After the United States declined to intervene, discovery commenced and the district court pared down Nelson's claims in a series of orders that concluded with a grant of summary judgment in favor of Sanford-Brown.

On appeal, and with support from the United States as *amicus curiae*, Nelson challenges the district court's application of the False Claim Act's subject matter jurisdictional bar; dismissal of defendant Career Education Corporation for failure to comply with Fed. R. Civ. P. 9(b); denial of Nelson's motion for leave to file a second amended complaint; and grant of summary judgment in favor of Sanford-Brown on the merits, including its rejection of the theory of implied false certification. Sanford-Brown has also filed a motion to seal and return in this court. We affirm the judgment of the district court and grant Sanford-Brown's motion to seal and return.

## I. Background

The False Claims Act (FCA) is "the primary vehicle by the Government for recouping losses suffered through fraud." 31 U.S.C. § 3729 *et seq.* The Attorney General may bring actions under the FCA directly in the name of the United States. 31 U.S.C. § 3730(a). Alternatively, a private person known as a "relator" may bring a *qui tam* action "in the name of the Government." 31 U.S.C. § 3730(b)(1). If the *qui tam* action results in the recovery of money for the government, the relator shares in the award. *See* 31 U.S.C. § 3730(d).

As relevant here, the FCA imposes civil liability on any person who "knowingly presents, or causes to be presented" to the United States or its representatives "a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1) (2006–2015), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B) (2010–15).[1] "Although the FCA uses the seemingly straightforward word 'knowingly,' the statute's state of mind element is actually quite nuanced." *U.S. v. King-Vassel*, 728 F.3d 707, 712 (7th Cir. 2013). To establish liability under the FCA, the defendant must have acted with "actual knowledge," or with "deliberate ignorance" or "reckless disregard"to the possibility that the submitted claim was false. 31 U.S.C. § 3729(a)(1)(A), (b). Because any of these three states of mind will suffice, the FCA does not require proof of specific intent to defraud. 31 U.S.C. § 3729(a)(1)(B). The FCA imposes civil penalties and treble

---

[1] In 2009, Congress amended and reorganized several provisions of the False Claims Act. Pub. L. 111–21, § 4(a)(1). The allegations in this case range from "2006–present," so for the purpose of our jurisdictional analysis, count I of Nelson's first amended complaint is based upon both 31 U.S.C. § 3729(a)(1) (for the time period from 2006 through May 19, 2009) and 31 U.S.C. § 3729(a)(1)(A) (for the time period from May 20, 2009 through the present). Although the 2009 amendments only applied on a prospective basis, Congress specified that § 3729(a)(1)(B) applied to all FCA claims pending on or after June 7, 2008. *See United States ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818, 822 n.2 (7th Cir. 2011). Because this action was filed well after June 7, 2008, count II of Nelson's first amended complaint is based exclusively on 31 U.S.C. § 3729(a)(1)(B) (the successor to § 3729(a)(2)). *Id.*

damages as remedies for each violation. 31 U.S.C. § 3729(a)(1)(G).

### A. The Higher Education Act

In order to receive federal education subsidies under Title IV of the Higher Education Act (HEA), an institution must enter into a Program Participation Agreement (PPA) with the U.S. Secretary of Education. 20 U.S.C. § 1094(a). Federal law provides that each PPA "shall condition the initial and continuing eligibility of an institution to participate in a program [for Title IV subsidies] upon compliance with [certain] requirements." 20 U.S.C. § 1094(a)(1)–(29). These requirements include the obligation to abide by a panoply of statutory, regulatory, and contractual requirements. In sum, the PPA includes certifications of existing facts and forward-looking promises that the institution will abide by certain statutes and regulations attendant to Title IV. We refer to these requirements as "Title IV Restrictions."

### B. The parties

One of the many beneficiaries of the HEA's subsidies, student loan, and grant programs was Career Education Corporation (CEC), the parent company of a nationwide network of for-profit colleges and universities, including Sanford-Brown, Limited (formerly known as Ultrasound Technical Services, Inc.) (SBL), which owned and operated Sanford-Brown College in Milwaukee, Wisconsin (SBC) at all times material to this proceeding.

From June 2008 through January 2009, Brent Nelson was the Director of Education at SBC. Nelson's responsibilities

included maintaining accreditation compliance related to academic progress and attendance; developing and implementing retention policies and practices; maintaining a student management database and generating appropriate reports; and completing "Green Files," which report faculty qualifications and graduate and placement rates to accreditors.

Nelson's tenure at SBC was brief but—according to Nelson—it was not uneventful. During his period of employment at SBC, Nelson concluded that staff, professors, administration, and ownership had engaged in many instances of fraudulent conduct in connection with the admission and retention of students for the purpose of maintaining Title IV HEA funding.

In July 2012, Nelson filed a complaint under seal against the defendants specifically alleging that since 2006, the three defendants (CEC, SBL and SBC) had violated—and were continuing to violate—federal regulations. Specifically, Nelson alleged that these entities violated provisions that: i) prohibited them from paying incentive compensation to certain types of employees involved in admissions and recruiting; ii) required them to maintain accreditation; iii) required them to refund to the U.S. Department of Education portions of Title IV funds for certain students who failed to complete at least 60% of a term; iv) prohibited them from harassing students to attend class; v) required students who received Title IV funds to maintain a minimum GPA or other adequate progress towards graduation; and vi) prevented them from admitting students with remedial needs into accelerated programs (collectively, the "disputed Title IV Restrictions"). In February 2013, the

government filed its decision not to intervene and the seal was lifted. In April 2013, Nelson filed his first amended complaint.

### C. Proceedings in the district court

Substantial motion practice ensued. On June 11, 2013, the defendants filed a joint motion to dismiss. On June 13, 2013, the district court entered its scheduling order, setting the cut-off date for dispositive motions at January 3, 2014, and set trial for April 14, 2014. On November 22, 2013, the district court granted in part and denied in part the defendants' motion to dismiss. *U.S. v. Career Educ. Corp.,* 2013 WL 6162673 (E.D. Wis., Nov. 22, 2013). The district court granted the motion to dismiss on the harassment and premature admission claims and dismissed co-defendant CEC pursuant to Fed R. Civ. P. 9(b). *Id.* at *6–9. On November 27, 2013, defendants filed a second motion to dismiss—this time for lack of subject matter jurisdiction.

But before the district court had a chance to rule on defendants' motion to dismiss for lack of subject matter jurisdiction, Nelson filed a motion for leave to file a second amended complaint to bring CEC back into the case based on "recent discovery." Nelson filed this motion on the court-prescribed deadline for dispositive motions, and defendants objected based on the timing (the motion was filed forty-two days after the court's order dismissing CEC) and on grounds that it would be unduly prejudicial to reel a defendant back in after the parties had proceeded through the end of discovery and the dispositive motion deadline with the understanding that CEC was no longer a defendant in the case. On January 17,

2014, the district court denied Nelson's motion for leave to file a second amended complaint.

The court then turned to the motion to dismiss for lack of subject matter jurisdiction. On March 17, 2014, the district court entered an order concluding that it lacked subject matter jurisdiction over most of Nelson's allegations because they were either based upon publically disclosed allegations (and he lacked independent knowledge of the information on which his allegations were based, rendering him ineligible for the "original source" exception to the prior public disclosure bar), or were barred by the FCA's first-to-file rule. *U.S. v. Sanford-Brown, Ltd.*, 27 F.Supp.3d 940 (E.D. Wis. 2014). After referring to this case as "a shadow of its former self," the district court held that its subject matter jurisdiction would be limited to Nelson's allegations from the start of the 2008 academic school year at SBC until the date he resigned his position in January 2009. *Id.* at 948.

On March 27, 2014, the district court entered an order reiterating that it retained jurisdiction because Nelson qualified as an original source for some claims, and confirmed that it would proceed to rule on the pending summary judgment motion directed at the merits of those remaining claims. *U.S. v. Sanford-Brown, Ltd.*, 2014 WL 1272098 (E.D. Wis., March 27, 2014). On June 13, 2014, the district court granted the defendants' motion for summary judgment. *U.S. v. Sanford-Brown, Ltd.*, 30 F.Supp.3d 806 (E.D. Wis., June 13, 2014). Nelson appeals, supported by the United States as *amicus curiae.*

## II. Subject matter jurisdiction

Before we address the substance of Nelson's *qui tam* allegations, we must first address his contention that the district court erroneously held that it lacked the subject matter jurisdiction over all claims except those arising during the period of his employment from 2008–09. *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 706 (7th Cir. 2014) ("[The Supreme Court's decision in] *Rockwell* compels us to address whether § 3730(e)(4) bars the relators' *qui tam* claims before addressing the merits of those claims."). In other words, the public disclosure bar is a limitation on subject matter jurisdiction. *Momence*, 764 F.3d at 706.

Nelson filed this action in 2012, but it potentially covers claims that have accrued since 2006—and two different versions of § 3730(e)(4) have operated as law throughout the time period covered by Nelson's suit. No matter. The 2010 version of § 3730(e)(4) is not retroactive and it controls here. *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 690 n.1 (7th Cir. 2014). Under the 2010 version of 31 U.S.C. § 3730(e)(4)(A), a claim must be dismissed if the information was publically disclosed, unless the relator is the original source of the disclosure. We review *de novo* challenges to the FCA's jurisdictional bars. *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 828 (7th Cir. 2013). We review findings of jurisdictional facts only for clear error. *Momence*, 764 F.3d at 707.

In this case, the district court held that the allegations underlying Nelson's suit (other than those covering the period of his employment from 2008–09) were publicly disclosed because of the "extraordinarily consequential concession,"

*Sanford-Brown, Ltd.*, 27 F.Supp.3d at 944, he made in his opposition to the defendants' motion to dismiss for lack of subject matter jurisdiction: "For purposes of this motion only, Nelson concedes that his allegations have been 'publically disclosed' pursuant to 31 U.S.C. 3730(e)(4)." *Id.* (quoting *Relator's Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction*, Doc. 56 at 6).

Nelson attempts to overcome this concession by claiming that "[f]or the sake of judiciary economy, [he] acknowledged that some of the information in his complaint was publically disclosed." Appellant Br. 41. But the text of Nelson's statement does not say that *some* of his allegations have been "publically disclosed." He said "his allegations"—and a party is bound by what it states in its pleadings. *Help At Home Inc. v. Medical Capital, L.L.C.*, 260 F.3d 748, 753 (7th Cir. 2001).

Alternatively, Nelson argues that even if he did concede that his allegations were publically disclosed, he did not concede that he based his suit upon knowledge of the prior public disclosure. However, in the wake of Nelson's unqualified concession that his allegations were publically disclosed (step one), we need not conduct a step two "based upon" analysis because once information becomes public, only the Attorney General or a relator who is an original source of the information may represent the United States. *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009) (quotations and citations omitted). Accordingly, the district court's conclusion rests on solid footing, and these claims survive only if Nelson is the original source.

The question then is whether Nelson was the "original source" of publically disclosed information. An original source is someone who: (1) prior to public disclosure has voluntarily disclosed to the government the information on which a claim is based; or who (2) has independent knowledge of the information on which his allegations are based—and that knowledge is material. 31 U.S.C. § 3730(e)(4)(B) (2010–2015). The district court concluded that Nelson was not an original source of false claims allegations about alleged misconduct that occurred before (pre-June 2008) and after (post-January 2009) his employment at SBC.

Nelson argues that the district court prematurely dismissed these claims because allegations filed upon information and belief may ultimately satisfy the original source requirement if he had independent knowledge of fraudulent conduct before the allegations of fraud were publicly disclosed. Appellant Br. 56. Yet we need not decide whether Nelson failed to qualify as an original source of claims from 2006–present (excluding 2008–2009) because he pleaded those allegations "upon information and belief." Rather, Nelson failed to qualify as an original source of those claims because he conceded that he lacked the "independent knowledge" of fraudulent conduct alleged to have occurred throughout that period. Here, Nelson's response to the defendants' motion to dismiss for lack of subject matter jurisdiction again proves fatal. It stated:

> Defendants also argue that relator is not an original source to the allegations pled upon "information and belief." Relator concedes that he does not have direct and independent knowledge of the allegations plead [sic] upon information and belief.

*Relator's Memorandum of Law in Opposition to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction,* Doc. 56 at 25 n.33). For the second time, Nelson "has fallen victim to the well-settled rule that a party is bound by what it states in its pleadings." *Soo Line R. Co. v. St. Louis Southwestern Ry. Co.*, 125 F.3d 481, 483 (7th Cir. 1997). Because a litigant is the master of its pleadings, we will not rewrite them "to controvert what it has already unequivocally told a court by the most formal and considered means possible." *Id.* We thus affirm the district court's jurisdictional ruling that Nelson qualifies as an original source only for claims from the period of his employment at SBC (June 2008–January 2009).[2]

### III. Nelson's First Amended Complaint

### A. The district court's dismissal of CEC

The district court concluded that the allegations in Nelson's first amended complaint failed to plead sufficient factual details to implicate CEC as a signatory to the PPAs, so the court dismissed it pursuant to Fed. R. Civ. P. 9(b). *Career Educ. Corp.*, 2013 WL 6162673 at *8. Nelson contends that CEC's dismissal was error.

We review *de novo* a district court's decision to dismiss a complaint or amended complaint for failing to satisfy the particularity requirement of Rule 9(b); we take the plaintiff's

---

[2] For the sake of completeness, we note that even the cases Nelson cites in support of his argument require him to possess independent knowledge in order to qualify as an original source. *U.S. ex rel. Smith v. Yale Univ.*, 415 F. Supp.2d 58, 79 (D. Conn. 2006); *United States ex rel. DeCarlo v. Kiewit/AFC Enters.*, 937 F.Supp. 1039, 1049 (S.D.N.Y. 1996).

allegations as true and draw all reasonable inference in the plaintiff's favor. *Tricontinental Indus., Ltd. v. Pricewaterhouse-Coopers, LLP*, 475 F.3d 824, 833 (7th Cir. 2007). When "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "The reference to 'circumstances' in the rule requires the plaintiff to state the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff" in order to satisfy Rule 9(b)'s heightened pleading standard. *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 777 (7th Cir. 1994) (internal quotations omitted). "The purpose [] of the heightened pleading requirement in fraud cases is to force the plaintiff to do more than the usual investigation before filing his compliant." *Ackersman v. Northwestern Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). To comply with Rule 9(b) in a multiple-defendant case like this one, the plaintiff must "plead sufficient facts to notify each defendant of his alleged participation in the scheme." *Goren v. New Vision Int'l., Inc.*,156 F.3d 721, 726 (7th Cir. 1998).

We turn to Nelson's first amended complaint. Nelson identified three defendants in the caption of his first amended complaint: CEC, Sanford-Brown, Limited, and Ultrasound Technical Services, Inc. Nelson refers to CEC, Sanford-Brown, Limited, and Ultrasound Technical Services, Inc., collectively, as "Defendants." 1st Am. Compl. ¶ 1. Nelson alleges that "CEC operates a chain of for-profit colleges, schools and universities nationwide" including "roughly 40 Sanford-Brown schools."

1st Am. Compl. ¶ 18. Further, he alleges that "Sanford-Brown, Limited is a subsidiary of CEC" and that "[o]n information and belief, Sanford-Brown, Limited co-operates Sanford-Brown College, Milwaukee."1st Am. Compl. ¶ 19.

With this outline of the defendants' corporate hierarchy in mind, we return to the central allegation of the first amended complaint, which reads as follows:

> As a condition to allowing their students to receive federal funding under Title IV/HEA, Defendants were required to sign a Program Participation Agreement ("PPA"), whereby they agreed to comply with certain statutory, regulatory and contractual requirements detailed in 20 U.S.C. § 1094 and supporting regulations, including 34 C.F.R. § 668.14.

1st Am. Compl. ¶ 24. We must decide whether the amended complaint's collective reference to "Defendants" and its contention that they were required to sign a PPA pleads sufficient facts to notify CEC of its alleged participation in the scheme. *Goren*, 156 F.3d at 726; *Vicom*, 20 F.3d at 777.

Each party argues that *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321 (7th Cir. 1994), supports its position. In *Jepson*, we affirmed the dismissal of an amended complaint alleging civil RICO violations against three corporations (two of which were subsidiaries of the third corporation) where the allegations did not adequately detail the predicate acts of mail and wire fraud to survive under Rule 9(b). *Id.* at 1331. The defendants argue that *Jepson* requires Nelson's allegations to be dismissed because they are lodged against "Defendants" generally and

do not specify which conduct was undertaken by each particular corporate defendant. Nelson counters that allegations need not be so specific when the corporate defendants "are related corporations that can most likely sort out their involvement without significant difficulty." *Id.* at 1329.

Nelson reads the phrase in question completely out of context. *Jepson* held the plaintiffs' mail and wire fraud allegations were insufficiently pleaded, so it was unnecessary for us to provide any further extraneous detail in the opinion about which corporate defendant was targeted by the insufficient allegations. *Id.* at 1331. We said on three separate occasions within *Jepson* that we were referring to the multiple corporate defendants collectively throughout the opinion for the sake of readability.[3] The phrase Nelson quotes has nothing whatsoever to do with pleading requirements.

*Jepson* stressed that under Rule 9(b), defendants "are entitled to be apprised of the roles they each played in the alleged scheme, and that absent a compelling reason, the plaintiff is normally not entitled to treat multiple corporate defendants as one entity." *Id.* at 1329 (citing cases). Here, the problem with Nelson's first amended complaint is this: Nelson references "Defendants" dozens of times in his amended

---

[3] *Jepson*, 34 F.3d at 1324 ("We shall refer to the Makita defendants collectively as 'Makita.'"); *id.* at 1328 ("For the sake of convenience in our discussion, we have lumped all three defendants under the single name 'Makita.'"); *id.* at 1329 ("We will assume for the purposes of our discussion that ... given that the three corporate defendants in this case are related corporations that can most likely sort out their involvement without significant difficulty.").

complaint, yet not once does he distinguish CEC's conduct from the conduct of either of the other two co-defendants. By failing to allege specific facts beyond the single allegation that CEC entered into a PPA, the first amended complaint fails to plead sufficient facts to notify CEC of the circumstances of its alleged participation in the scheme. *Goren*, 156 F.3d at 726; *Vicom*, 20 F.3d at 777. Accordingly, we reject Nelson's sweeping contention that his allegations against all "Defendants" should be treated as specific allegations against one defendant, CEC.

## B. The district court's denial of Nelson's motion for leave to file a second amended complaint

After the district court dismissed CEC and following additional discovery directed at the issue of CEC's connection to the PPAs, Nelson moved for leave to file a second amended complaint to cure the Rule 9(b) defects based on "recent discovery." Defendants objected, and the district court denied Nelson's motion. On appeal, Nelson raises two related challenges to the district court's denial of leave to file a second amended complaint. First, he argues that the district court should have granted him leave to file a second amended complaint because he filed his motion on the last day the parties agreed upon for any amendments. Second, he argues that justice requires that he be afforded at least one opportunity to cure the Rule 9(b) defects. We review the district court's decision under the highly deferential abuse of discretion standard. *Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2005).

While the parties' stipulated scheduling order agreed that amendments must be made by January 3, 2014, such an

agreement does not impact the district court's discretion to grant or deny the motion. The well-settled rule is that a party may amend its complaint once as a matter of right, twice or more only at the district court's discretion. *See Hukic v. Aurora Loan Services*, 588 F.3d 420, 432 (7th Cir. 2009) (denying leave to file a second amended complaint); Fed. R. Civ. P. 15(a). Further, while leave to amend should be freely given "when justice so requires,"*Alioto v. Town of Lisbon,* 651 F.3d 715, 719 (7th Cir. 2011); Fed. R. Civ. P. 15(a)(2), a district court has "broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." *Arreola v. Godinez,* 546 F.3d 788, 796 (7th Cir. 2008).

Here, the district court's order dismissing CEC was entered on November 22, 2013. Instead of moving for reconsideration, Nelson waited forty-two days before moving for leave to bring CEC back into the case. Like the district court, we find no good reason for this delay in the record. Had the district court granted a second motion for leave to amend, it would have returned a dismissed party, CEC, back into litigation when discovery had proceeded for weeks and SBC had proceeded under the assumption that CEC was no longer involved. CEC's return to the litigation was obviously substantially prejudicial to CEC, and was also prejudicial to SBC because it had proceeded through discovery under the reasonable assumption that CEC would remain dismissed. In these respects, this situation is strikingly similar to *Hukic,* where we affirmed the denial of a motion for leave to file a second amended complaint when it was filed near the close of discovery because

discovery had already taken place with the initial claims and defendants in mind. 588 F.3d at 432. As in *Hukic,* the district court did not abuse its discretion by failing to grant Nelson leave to file a second amended complaint.

## IV. Analysis

### A. SBC's Program Participation Agreements

We now turn to the merits. In September 2005, SBL's campus in Fenton, Missouri, entered into a PPA with the U.S. Secretary of Education (2005 PPA). In bold lettering on the first page of the fifteen-page agreement reads the following:

> The execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program.

Appellees' App. 92 at ¶ 1. The 2005 PPA also provides, in relevant part, that "[t]he Institution understands and agrees that it is subject to and will comply with the program statutes and implementing regulations for institutional eligibility ... ."[4]

---

[4] The 2005 PPA asserts that upon entry, the signatory certifies compliance with—to name just a few—Title VI of the Civil Rights Act of 1964, as amended, and the implementing regulations, 34 C.F.R. Parts 100 and 101 (barring discrimination on the basis of race, color or national origin); Title IX of the Education Amendments of 1972 and the implementing regulations, 34 C.F.R. Part 106 (barring discrimination on the basis of sex); The Family Rights and Privacy Act of 1974 and the implementing regulations, 34 C.F.R. Part 99; Section 504 of the Rehabilitation Act of 1973 and the implementing regulations, 34 C.F.R. Part 104 (barring discrimination on the basis of physical handicap); and the Age Discrimination Act of 1975 and the

(continued...)

By our estimation, the executed 2005 PPA incorporates by reference thousands of pages of other federal laws and regulations.

When the 2005 PPA was executed by John M. Larson, President and Chief Executive Officer of Sanford-Brown College, and the U.S. Department of Education's designated representative, the signatories: (i) intended that the campuses covered by the 2005 PPA would operate in compliance with the conditions specified in the 2005 PPA, including institutional eligibility requirements; and (ii) believed that all certifications and statements of fact contained in the 2005 PPA were true and accurate. *See* Larson Decl. at ¶¶ 5, 6. In 2006, SBC was added to the 2005 PPA.

In December 2007, Sanford-Brown's campus in Jacksonville, Florida, entered into a PPA with the U.S. Department of Education (2007 PPA). The identical, bolded requirement that the Agreement be executed for initial or continued participation in any Title IV, HEA Program appears on the first page of the 2007 PPA, as does the same statement about compliance for the purpose of institutional eligibility. The panoply of federal statutes and regulations that appeared in the 2005 PPA also remained—in fact, more were added—and the same representations about the truthfulness and accuracy of the statements of fact contained in the 2005 PPA were made with respect to the 2007 PPA. *See* McCullough Decl. at ¶¶ 7, 8. In May 2008, with the Education Department's approval, SBC was removed

---

[4] (...continued)
implementing regulations, 34 C.F.R. Part 110.

from the 2005 PPA and added as an additional campus covered under the 2007 PPA.

**B. Theories of *Qui Tam* liability**

Regarding Nelson's claims from the period of his employment at SBC (June 2008–January 2009), the district court granted summary judgment in favor of the defendants principally because it found "no clear manifestation of congressional or regulatory intent to condition payment of Title IV federal subsidies on compliance with the disputed Title IV Restrictions." *Sanford-Brown, Ltd.,* 30 F.Supp.3d at 814. In FCA cases, we review a district court's grant of summary judgment in favor of the defendant *de novo,* construing all facts in favor of the nonmoving party. *U.S. ex rel. Feingold v. AdminaStar Federal, Inc.,* 324 F.3d 492, 494 (7th Cir. 2003).

*1.   Nelson's § 3729(a)(1)(B) False Record Theory*

The FCA imposes liability where any party "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). To establish liability under this provision, a relator must prove that: (1) the defendant made a statement or record in order to receive money from the government; (2) the statement or record was false; and (3) the defendant knew it was false. *U.S. ex rel. Yannacopoulos v. General Dynamics,* 652 F.3d 818, 822 (7th Cir. 2011).

Nelson and the government, as *amicus curiae,* argue that because the defendants agreed to comply with all Title IV regulations by entering into the PPA, they fraudulently used it when they made—or caused students to make or

use—applications for federal subsidies with knowledge that they were not in compliance with the Title IV Restrictions. *See* Appellant Br. 18 ("By and through the PPAs and Title IV Services Agreement, CEC and Sanford Brown agreed and promised to comply with all Title IV regulations."). SBC counters that to satisfy the "knowingly" component of the statute, Nelson must offer proof that the institution entered into the PPA with the intent to defraud the government out of subsidies.

These dueling views stem from the parties' differing interpretations of our decision in *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914 (7th Cir. 2005). In *Main,* we considered whether a PPA entered into by an institution qualified as a false record under the FCA where the promises of future compliance it contained were false when the parties entered into the agreement. 426 F.3d at 916. We concluded that it was and reversed the district court's order dismissing the case, concluding that "[i]f a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the paperwork." *Id.*

The outcome in *Main* was dependent on the defendants' mindset when it entered into the PPA. The relator's complaint alleged that university ownership intended to defraud the government out of subsidies from the outset; consequently, we held that the institution's PPA with the Secretary and all subsequent claims for payment submitted incident to it were poisoned by the institution's underlying bad faith. 426 F.3d at 917 ("To prevail in this suit Main must establish that the University not only knew, when it signed the [PPA], that contingent fees to recruiters are forbidden, but also planned to

continue paying those fees while keeping the Department of Education in the dark."); *accord, U.S. ex rel. Miller v. Weston Educ., Inc.*, 784 F.3d 1198, 1204 (8th Cir. 2015) ("To demonstrate this promise was false, it is not enough to show that [the institution] did not comply with the PPA; relators must show that [the institution], when signing the PPA, knew accurate grade and attendance records were required, and that [the institution] intended not to maintain those records.").

To establish that the defendants knowingly used a false record under *Main*, the relator must establish the defendants' mindset at the time of entry into the PPA. The third prong of *Yannacopoulos* reaffirms this *mens rea* requirement. In other words, Nelson needed to prove that SBC *knowingly* entered into the PPA *to defraud the government* (thereby creating a "false record") and then planned to "use" the PPA thereafter to submit poisoned (and therefore, false) claims for payment. U.S.C § 3729(a)(1)(B) ("knowingly … uses"). *Main* underscores this conclusion through its elaboration on the definition of fraud that promises of future performance do not become false due to subsequent non-compliance. 426 F.3d at 916. Proof of "fraud requires more than breach of promise: fraud entails making a false representation, such as a statement that the speaker will do something *it plans not to do.*" *Id.* at 917 (emphasis added).

In this case, Nelson did not prove that SBC entered the PPA in bad faith. He did not depose the individuals who signed the PPAs, nor did he present any documentary evidence concerning SBC's execution of the PPAs. He elicited no evidence in discovery of defendants' fraudulent mindset when SBC was added as an additional campus covered under the PPA, or at

any other time throughout its operation. The only record evidence of the defendants' mindsets are the declarations filed by Larson and McCullough. Not only do these declarations fail to support Nelson's contention that these individuals intended to defraud the Education Department out of subsidies—they explicitly assert the opposite. *See* Larson Decl. at ¶¶ 5, 6; McCullough Decl. at ¶¶ 7, 8. Under these facts, SBC is not liable under Nelson's False Record theory.

## 2. *Nelson's 31 U.S.C § 3729(a)(1)(A) False Presentment Theory*

The FCA also imposes liability where any party "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C § 3729(a)(1)(A). To establish liability under this theory, a relator must prove the existence of: (1) a false or fraudulent claim; (2) which was presented for payment, or caused to be presented for payment, by the defendant; (3) with knowledge the claim was false. *U.S. ex rel. Fowler v. Caremark RX, L.L.C.*, 496 F.3d 730, 741 (7th Cir. 2007), *overruled in part on other grounds by Glaser*, 570 F.3d at 920.

Nelson and the government argue that SBC's certification upon entry into the PPA that it would abide by the Title IV Restrictions causes SBC to present false or fraudulent claims for payment or approval to the government if it violates any of the PPA's conditions because adherence to those IV Restrictions are "conditions of payment." Based on this theory, an institution must remain in compliance with all of the PPA's conditions in order to remain lawfully eligible to continue receiving federal subsidies. Thus, Nelson and the government

argue that compliance with the PPA is not merely a condition of participation, but a condition of payment. *See* Appellant Br. 29 ("[U]nder the FCA, payment and participation are one and the same, as a claimant is not entitled to payment unless eligible to participate."). According to this theory, the PPA serves as a trigger poised to impose FCA liability at some indefinite point in the future, because continued lawful receipt of the federal subsidies depends on continued compliance with the PPA. In support of their argument that continuing ongoing eligibility is a statutory requirement of participation in receipt of Title IV funding, Nelson and the government rely on *United States ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166 (9th Cir. 2006), *Main,* and the PPA's implementing regulation, which states that "[a] participation agreement *conditions* the initial and continued *participation* of an eligible institution ... upon compliance with ... [the Title IV Restrictions.]" 34 C.F.R. § 668.14(a)(1) (emphasis added). *See* Appellant Br. 27.

Under the logic of *Main*, 426 F.3d at 917, and *Yannacopoulos*, 652 F.3d at 824, SBC argues that so long as the institution enters into the PPA in good faith, the Title IV Restrictions it promises to adhere to are not a trigger set to impose liability if violated in the future, because those restrictions are merely conditions of initial participation that must be true at the time the PPA was entered into, not conditions that are prerequisites to payment for the purpose of liability under the FCA. *Main* recognizes that promises of future performance do not become "false" due to subsequent non-compliance. 426 F.3d at 917. And *Main* goes on to suggest that a violation of Title IV Restrictions *after* signing a PPA in good faith is not an actionable false claim: "[a] university that accepts federal funds that

are contingent on following a regulation, which it then violates, has broken a contract.*" Id.* This distinction between fraud at the outset and breach of contract after entry into a PPA is significant "because a mere breach of contract does not give rise to liability under the False Claims Act." *Yannacopoulos,* 652 F.3d at 824.

Despite *Main*'s signals, only one circuit decision has squarely addressed whether violations of Title IV Restrictions after good-faith entry into Title IV trigger FCA liability. *See U.S. ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 797 (8th Cir. 2011). In concluding that they do not, *Vigil* drew its reasoning from *Main* and *Hendow*, where the complaints that had been dismissed were reinstated because the relator alleged that each institution submitted fraudulent applications to establish their *initial* Title IV eligibility. *See Main,* 426 F.3d at 916 (assuming that the institution "lied to the Department of Education in order to obtain a certification of eligibility that it could not have obtained had it revealed the truth"); *Hendow,* 461 F.3d at 1169 (relator alleges fraud occurred "in order to become eligible to receive Title IV funds").

We agree with *Vigil*'s conclusion because it is the logical extension of *Main* and our other FCA authorities. Good-faith entry into the PPA is the condition of payment necessary to be eligible for subsidies under the U.S. Department of Education's subsidies program. Absent evidence of fraud before entry, non-performance after entry into an agreement for government subsidies does not impose liability under the FCA. Our earlier decisions in *Yannacopoulos, Main,* and *U.S. ex rel. Gross v. AIDS Research Alliance-Chi.,* 415 F.3d 601, 604 (7th Cir. 2005) (pre-dating *Main* and holding that FCA liability requires an initial

fraudulent certification of compliance with applicable authorities to be a condition of or prerequisite to government payment), compel this result because here, as in *Vigil,* the relator has not alleged—nor has he proven—that SBC fraudulently secured its initial Title IV eligibility, so no false certification of compliance is attributable to SBC. Accordingly, we join the Eighth Circuit and hold that FCA liability is not triggered by an institution's failure to comply with Title IV Restrictions subsequent to its entry into a PPA, unless the relator proves that the institution's application to establish initial Title IV eligibility was fraudulent.[5]

Distilled to its core, Nelson and the government's theory of liability lacks a discerning limiting principle. They argue that compliance with all the contents of the PPA are conditions of payment, while candidly acknowledging that certain violations of the PPA do not impose FCA liability. These positions are at odds with each other. If we adopt Nelson and the government's argument and ignore the significant differences in effect that good-faith entrance and fraudulent inducement into a PPA have on subsequent violations, then any of the conditions in the PPA that are not met by the institution would have the potential to impose strict liability on it under the FCA. That proposition is untenable. *See Momence,* 764 F.3d at 712.

---

[5] Our decisions in *Yannacopoulos, Main,* and *Gross,* as well as the Eighth Circuit's decision in *Vigil,* part ways with the Ninth Circuit's decision in *Hendow* on the FCA consequences of a violation of Title IV Restrictions that occurs after good-faith entry into a PPA. To the extent that is the case, we respectfully disagree with the Ninth Circuit.

Just last term, in *Momence,* we cautioned against the adoption of a similarly groundbreaking and blanket theory of FCA liability when we acknowledged that

> under the relators' theory, even a *single* regulatory violation would be a condition of *any and all* payments subsequently received by the facility inasmuch as the regulators *could* terminate the facility for practically any deficiency.

*Id.* (emphasis in original). There we rejected as "absurd" the relators' argument that compliance with regulations were conditions of payment in the Medicare and Medicaid context. *Id.*

Consistent with *Momence*'s foreshadowing, we conclude that it would be equally unreasonable for us to hold that an institution's continued compliance with the thousands of pages of federal statutes and regulations incorporated by reference into the PPA are conditions of payment for purposes of liability under the FCA.[6] Although a number of other circuits have

---

[6] Although Nelson asserts that these concerns are hyberbole because "minor technical violations ... do not give rise to an FCA claim," *see U.S. ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1019 (7th Cir. 1999), "material[ity]" speaks only to the nature of the *violation.* § 3729(a)(1)(B) ("material *to a false or fraudulent claim*"). Whether a violation is material or not has no impact on whether we characterize compliance or noncompliance with the Title IV Restrictions incident to the PPA as a condition of participation or as a condition of payment. If compliance with the PPA is a condition of payment, the consequence of that determination would (in addition to importing boundless FCA jurisdiction on any recipient of government subsidies) simultaneously undermine its existing administra-
(continued...)

adopted this so-called doctrine of implied false certification, *id.* at 711 n.13 (citing cases),[7] we decline to join them and instead join the Fifth Circuit. *See U.S. ex rel. Steury v. Cardinal Health, Inc.,* 625 F.3d 262, 270 (5th Cir. 2010).

The FCA is simply not the proper mechanism for government to enforce violations of conditions of participation contained in—or incorporated by reference into—a PPA. *Mikes v. Straus,* 274 F.3d 687, 699 (2d Cir. 2001) ("The False Claims Act was not designed for use as a blunt instrument to enforce compliance with all [] regulations."). Rather, under the FCA, evidence that an entity has violated conditions of participation after good-faith entry into its agreement with the agency is for the agency—not a court—to evaluate and adjudicate. *See, e.g., id.* at 700, 702; *U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.,* 543 F.3d 1211, 1220 (10th Cir. 2008) (conditions of participation "are enforced through administrative mechanisms").

---

[6] (...continued)

tive enforcement powers in exchange for this newfound and robust theory of FCA liability. The Eighth Circuit has observed that, under these circumstances, "[i]t would be curious to read the FCA, a statute intended to protect the government's fiscal interests, to undermine the government's own regulatory procedures." *Vigil*, 639 F.3d at 799. We agree.

[7] The FCA doctrine of implied false certification "treats a bill submitted to the government as an implicit assurance that the bill is a lawful claim for payment, an assurance that's false if the firm submitting the bill knows that it's not entitled to payment." *U.S. ex. rel. Grenadyor v. Ukrainian Village Pharmacy, Inc.,* 772 F.3d 1102, 1106 (7th Cir. 2014). As *Grenadyor* notes, before today this doctrine was "unsettled" in this circuit. *Id.* (citing *Momence,* 764 F.3d at 711 and n.13).

Lest there be any doubt about the U.S. Department of Education's ability to enforce the PPA through administrative mechanisms here, its regulations are clear that at all times it possessed the authority up to and including the power to terminate SBC from its subsidy program. *See* 34 C.F.R. §§ 600.41(a)(1); 668.86; *Conner,* 543 F.3d at 1220 (observing that "the ultimate sanction for violation of such conditions is removal from the government program"). However, in this case, the subsidizing agency—as well as other federal agencies—have already examined SBC multiple times over and concluded that neither administrative penalties nor termination was warranted. *See* Appellees' Br. 9.

In sum, "PPA" is an abbreviation for Program *Participation* Agreement—not Program *Payment* Agreement. When entered in good faith, a PPA memorializes conditions of participation (not conditions of payment) in connection with the U.S. Department of Education's subsidies program. In this case, the agency's regulations have at all times provided—and continue to provide—a governmental enforcement mechanism in the form of an administrative proceeding before the subsidizing agency, whereby any evidence of violations of conditions of participation may be considered and adjudicated. Accordingly, we reject Nelson's False Presentment theory.

### V. SBC's Motion to Seal and Return

Finally, we must address SBC's outstanding motion before this court to seal and return to the district court several documents in the appellate record. Material in the appellate record is presumptively public. *See Baxter Int'l, Inc. v. Abbott Labs.,* 297 F.3d 544, 545–46 (7th Cir. 2002). We recognize only

three classes of material subject to seal: trade secrets, information covered by a recognized privilege, and information required by statute to be maintained in confidence. *Id.* at 546. If the material in question falls into one of these three categories, then the two competing interests to be weighed by the court are the moving party's interest in privacy and the public's interest in transparency. *Goesel v. Boley Intern. (H.K.) Ltd.*, 738 F.3d 831, 833 (7th Cir. 2013). Our reasoning in *Baxter* and *Goesel* (and the general principles underlying *qui tam* policy) inform the conclusion that the public's interest in the judicial record is especially acute where—as here—the government has subsidized the good or service underlying the litigation from the public fisc. Notwithstanding other applicable laws, a party that is subsidized by the public fisc and that seeks to seal portions of the record must satisfy a higher burden than a party that receives no government subsidy must satisfy in order to achieve the same result. Either way, the presumption in favor of disclosure can be rebutted. *Goesel,* 738 F.3d at 833.

The parties agree that SBC's motion is based on a claim of trade secrets—they disagree over whether SBC has provided sufficient detail about its claims to warrant continued relief. SBC asserts that Doc. 66 contains one exhibit, consisting of an internal memorandum setting forth and explaining changes to SBC's internal grading policy; that Doc. 67 contains four exhibits, including copies of SBC's annual bonus plans and other bonus-related documents; and that Doc. 82 contains twenty-five exhibits related to the internal operations of SBC. In short, SBC argues that because these documents discuss the reasons and strategies behind its decision to alter the grading

scale, its decision-making process relating to how it compensates its employees, and addresses other aspects of internal operations, then this information constitutes trade secrets in the field of for-profit higher education, and therefore is entitled to be sealed.

Nelson grounds his counterargument in a single authority—*Baxter*—for the proposition that SBC has not provided enough detail to support its claim that the documents are protected as trade secrets to overcome the presumption of openness. 297 F.3d at 547. So we must now decide whether SBC has described the documents it wishes to remain under seal in sufficient detail to pass muster under *Baxter.*

In *Baxter,* a motions panel rejected a joint motion to seal commercial documents due to the motion's perfunctory nature. 297 F.3d at 546. The parties then filed a renewed joint motion alleging that the parties' agreement justified sealing the documents. *Id.* We rejected it, too, explaining that we would not seal documents in the appellate record simply because the parties had agreed to do so among themselves because that practice deprives the public of material information about the judicial process. *Id.* at 547–48. We recently reaffirmed this rationale in *Goesel,* 738 F.3d at 835 (confidentiality agreement alone was insufficient to grant parties' motion to seal settlement agreement). Notwithstanding the pre-*Baxter* confusion surrounding motions to seal, it concludes with clear instructions:

> the court will, in the future deny outright any motion under Operating Procedure 10 that does not analyze in detail, document by document,

> the propriety of secrecy, providing reasons and
> citations. Motions that represent serious efforts
> to apply the governing rules will be entertained
> favorably...[while m]otions that simply assert a
> conclusion without the required
> reasoning...[will] have no prospect of success.

*Baxter,* 297 F.3d at 548.

SBC's motion concerning the four exhibits associated with Documents 66 and 67 sets forth the specific contents of the documents associated with each, explains why those documents entail proprietary trade secrets, and provides justification for why they should remain sealed. Accordingly, SBC has satisfied its high burden, and we order that those documents remain sealed.

However, we need not decide whether *Baxter* requires us to unseal the twenty-five exhibits connected to Doc. 82 because these documents were sealed in the district court as the consequence of a motion for leave to file under seal filed *by Nelson*. *See* Doc. 78. That Nelson now seeks to unseal documents that the district court sealed on his motion is noteworthy because "[b]y asking for the very condition the court subsequently imposed, [Nelson] waived any argument against it." *United States v. Cary,* 775 F.3d 919, 927 (7th Cir. 2015) (applying waiver where defendant sought mental health treatment in the district court and then contested the imposition of that request on appeal).

SBC's motion also seeks to return to the district court, or, in the alternative, to seal, district court docket entries 58, 105, and 106, which consist of confidential settlement reports that the

district court required the parties to file so it could monitor the progress of the parties' settlement negotiations. Nelson asserts in his response that he does not oppose SBC's request. We have in the past ordered documents returned to the district court in order to prevent unwarranted disclosure of commercially sensitive information. *Baxter*, 297 F.3d at 548. None of the district court's orders that are the subject of this appeal makes mention of, let alone relies on, any of the documents at issue in SBC's motion, and "returning documents to the district court is appropriate when they are not among the materials that formed the basis of the parties' dispute and the district court's resolution." *KM Enters., Inc., v. Global Traffic Techs., Inc.*, 725 F.3d 718, 734 (7th Cir. 2013) (citation omitted). Because SBC's request is reasonable, narrow, specific, and justified, we will grant it. The clerk is directed to return the documents comprising district court docket entries 58, 105, and 106 to the chambers of Judge Stadtmueller.

## VI. Conclusion

The district court did not err by holding that its subject matter jurisdiction was limited to the period of time when Nelson was employed by SBC. Nor did the district court err by dismissing Nelson's first amended complaint against CEC for failure to comply with Fed R. Civ. P. 9(b). Because Nelson did not file his motion for leave to file a second amended complaint in a diligent manner, the district court did not abuse its discretion by denying it. On the merits, FCA liability is not triggered by an institution's failure to comply with Title IV Restrictions subsequent to its entry into a PPA, unless the relator proves that the institution's application to establish initial Title IV eligibility was fraudulent. Under the FCA,

evidence that an institution has violated conditions of participation after good-faith entry into a PPA is for agencies, not courts, to evaluate and adjudicate. For these reasons, the district court's grant of summary judgment in favor of the defendants is AFFIRMED. The clerk is directed to keep the documents comprised of district court docket entries 58, 105, and 106 sealed, and to return them to the chambers of Judge Stadtmueller.