Paul Bishop v. Wells Fargo

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2015

(Argued: March 1, 2016      Decided: May 5, 2016)

Docket No. 15-2449

_____

PAUL BISHOP, ROBERT KRAUS, UNITED STATES OF AMERICA, EX REL PAUL BISHOP, EX REL ROBERT KRAUS,

*Plaintiffs-Appellants*,

STATE OF NEW YORK, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF DELAWARE, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, DISTRICT OF COLUMBIA, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF FLORIDA, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF HAWAII, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF CALIFORNIA, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF INDIANA, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF ILLINOIS, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF MINNESOTA, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF NEVADA, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF NEW HAMPSHIRE, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, COMMONWEALTH OF MASSACHUSETTS, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF NEW MEXICO, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF MONTANA, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF NORTH CAROLINA, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF NEW JERSEY, EX

1

REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF OKLAHOMA, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF RHODE ISLAND, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, STATE OF TENNESSEE, EX REL PAUL BISHOP, EX REL ROBERT KRAUS, COMMONWEALTH OF VIRGINIA, EX REL PAUL BISHOP, EX REL ROBERT KRAUS,

*Plaintiffs,*

—v.—

WELLS FARGO & COMPANY, WELLS FARGO BANK, N.A.,

*Defendants-Appellees.*[*]

————————

B e f o r e:   KATZMANN, *Chief Judge*, SACK and LOHIER, *Circuit Judges.*

————————

Appeal from the dismissal of a *qui tam* action under the False Claims Act ("FCA") by the United States District Court for the Eastern District of New York (Brian M. Cogan, *Judge*). The relators allege that defendants Wells Fargo & Company and Wells Fargo Bank, N.A., defrauded the government within the meaning of the FCA by falsely certifying that they were in compliance with various banking laws and regulations when they borrowed money at favorable rates from the Federal Reserve's discount window. The district court granted the defendants' motion to dismiss, holding that the banks' certifications of compliance were too general to constitute legally false claims under the FCA and that the relators had otherwise failed to allege their fraud claims with particularity. We agree with the district court that the relators have not sufficiently pleaded their claims under the FCA, and therefore affirm.

————————

---

[*] The Clerk of the Court is respectfully directed to amend the caption to conform to the above.

JOEL M. ANDROPHY, ZENOBIA HARRIS BIVENS (Rachel L. Grier, *on the brief*), Berg & Androphy, Houston, Texas (George C. Pratt, Uniondale, New York, *on the brief*), *for Plaintiffs-Appellants*.

GERALD A. NOVACK, K&L Gates LLP, New York, New York (Amy P. Williams, K&L Gates LLP, Charlotte, North Carolina; Noam A. Kutler, K&L Gates LLP, Washington, District of Columbia, *on the brief*), *for Defendants-Appellees*.

_____

KATZMANN, *Chief Judge*:

At the heart of the case before us is the False Claims Act ("FCA"), which forbids "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval" to the United States government. 31 U.S.C. § 3729(a)(1)(A). In 2011, Robert Kraus and Paul Bishop (together, the "relators") brought a *qui tam* action under the FCA on behalf of the United States against Wells Fargo & Company and Wells Fargo Bank, N.A. (together, "Wells Fargo"). The relators' claims hinge on what they allege to be massive control fraud perpetrated by Wachovia Bank and World Savings Bank from at least 2001 through 2008. World Savings Bank merged into Wachovia in 2006, and the combined entity merged into Wells Fargo in 2008. The relators contend that Wachovia and, after the merger, Wells Fargo defrauded the government within the meaning of the FCA by falsely certifying that they were in compliance with

3

various banking laws and regulations when they borrowed money at favorable rates from the discount window operated by the Federal Reserve (the "Fed"). The relators contend that the Fed would not have permitted the banks to borrow at those favorable rates had it known that they were undercapitalized as a result of the fraud. The government declined to intervene in the relators' suit. Wells Fargo filed a motion to dismiss, which the district court granted, holding that the banks' certifications of compliance were too general to constitute legally false claims under the FCA and that the relators had otherwise failed to allege their fraud claims with particularity. The relators appealed.

We agree with the district court. As this Court has long recognized, the FCA was "not designed to reach every kind of fraud practiced on the Government." *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001) (quoting *United States v. McNinch*, 356 U.S. 595, 599 (1958)). Even assuming the relators' accusations of widespread fraud are true, they have not plausibly connected those accusations to express or implied false claims submitted to the government for payment, as required to collect the treble damages and other statutory penalties

available under the FCA. Accordingly, we affirm the district court's judgment dismissing the suit.

## BACKGROUND

### A. Relevant Banking Regulations

We begin with some context about the banking regulatory scheme at work here. As the relators point out in their briefing, financial institutions in the United States are subject to many different laws and regulations, and are overseen by a number of different regulators, including the Fed. The Fed is responsible for maintaining the stability of the U.S. financial system. *See* Bd. of Governors of the Fed. Reserve Sys., *The Federal Reserve System: Purposes and Functions* 1 (9th ed. June 2005). As part of this mandate, the Fed, acting through its regional Federal Reserve Banks, acts as a backup lender of last resort for banks through its "discount window." *Id.* at 45–46. One of the purposes of the discount window is to enable banks to borrow to meet their reserve requirements. Under federal regulations, banks must hold certain balances, either in cash or in certain accounts with the Fed. *Id.* at 31. A low level of reserves does not by itself indicate that the bank is suffering from financial weakness; for example, a bank could have

5

anticipated receiving cash from another source that did not come through at the expected time. *Id.* at 45.

Nonetheless, banks were historically reluctant to borrow through the Fed's discount window out of fear of being stigmatized as financially weak. The Fed had previously lent money to banks at below-market rates, but it did not want banks to borrow at the discount window only to relend at higher rates to other banks. Accordingly, it imposed a requirement that borrowers first prove they had exhausted other avenues for credit. *See* Extensions of Credit by Fed. Reserve Banks; Reserve Requirements of Depository Insts., 67 Fed. Reg. 67,777, 67,778 (Nov. 7, 2002). The result was that borrowing from the discount window indicated to the public that the bank had no other options. According to the Fed, this stigma "in turn . . . hampered the ability of the discount window to buffer shocks to the money markets," especially in times of financial crisis, when the Fed most needed to strengthen the financial system. *Id*. To address this concern, the Fed adopted a new two-tiered structure in 2003.

Under that structure, banks in "generally sound financial condition" are eligible to borrow at the primary credit rate, which is set above the target Federal

Funds Rate. 12 C.F.R. § 201.4(a); Bd. of Governors of the Fed. Reserve Sys., Lending to Depository Institutions, available at http://www.federalreserve.gov/ monetarypolicy/bst_lendingdepository.htm. Banks that are not eligible for the primary credit rate can instead borrow at the secondary credit rate, set above the primary credit rate. 12 C.F.R. § 201.4(b). Although the discount window is still intended to be only a "backup source of liquidity," banks eligible for the primary credit rate no longer need to show that they have first exhausted other sources of credit. 67 Fed. Reg. at 67,780. Indeed, purposefully little is required of the borrower at the time of the loan; the Fed describes the primary credit program as a "'no questions asked' program with minimum administration," meaning that "qualified depository institutions seeking overnight primary credit ordinarily are asked to provide only the minimum amount of information necessary to process the loan. In nearly all cases, this would be limited to the amount and term of the loan." J.A. 437. The Fed clarified that these changes were necessary to induce banks to borrow from it, in turn increasing the Fed's ability to protect the financial system. *See* 67 Fed. Reg. at 67,778.

To enhance its ability to influence liquidity during the recent financial crisis, the Fed instituted the Term Auction Facility ("TAF") from December 2007 through 2010. *Term Auction Facility*, Bd. of Governors of the Fed. Reserve Sys., https://www.federalreserve.gov/monetarypolicy/taf.htm (last updated Nov. 24, 2015). TAF operated as an auction; banks would bid on the amount of money they wanted to borrow at specific interest rates, and the Fed would match the amount it wanted to lend with the amounts requested, starting with the highest offered rates. The Fed would then set the rate for all borrowers at the lowest rate which would satisfy the total amount of money allotted to be loaned out. *See* Extensions of Credit by Fed. Reserve Banks, 72 Fed. Reg. 71,202, 71,203 (Dec. 17, 2007). Only banks in "generally sound financial condition" (*i.e.*, those eligible for the primary credit rate) were permitted to participate. 12 C.F.R. § 201.4(e). There is no dispute that Wachovia and Wells Fargo borrowed money through the discount window at the primary credit rate and through TAF after the Fed deemed them eligible.

The Fed's authority to lend to banks is governed by Regulation A, 12 C.F.R. pt. 201, which was promulgated under the Federal Reserve Act and the International Banking Act of 1978, *see* 12 C.F.R. § 201.1. Regulation A provides

8

that a "Federal Reserve Bank may extend primary credit on a very short-term basis, usually overnight, as a backup source of funding to a depository institution that is in generally sound financial condition in the judgment of the Reserve Bank. Such primary credit ordinarily is extended with minimal administrative burden on the borrower." 12 C.F.R. § 201.4(a). Similarly, Regulation A gives a Federal Reserve Bank the discretion to lend "to a depository institution that is not eligible for primary credit if, in the judgment of the Reserve Bank, such a credit extension would be consistent with a timely return to a reliance on market funding sources." 12 C.F.R. § 201.4(b). Regulation A is explicit that any loan is made at the sole discretion of the Fed: "This section does not entitle any person or entity to obtain any credit or any increase, renewal or extension of maturity of any credit from a Federal Reserve Bank." 12 C.F.R. § 201.3(b).

Regulation A also mandates the information that a Federal Reserve Bank must collect to determine whether a given bank is eligible to receive a loan through either the primary or the secondary credit program. *See* 12 C.F.R. § 201.4. Although Regulation A tasks each Federal Reserve Bank with obtaining adequate information about the banks under its supervision, it does not require the

9

borrowing banks themselves to provide any specific information. *See id*. In practice, the Federal Reserve Banks rely on information that the banks are otherwise required to report to regulators, including quarterly Call Reports filed with banks' designated federal supervisory agencies. *See* 12 U.S.C. § 1817(a)(3); *The Fed. Reserve System: Purposes and Functions supra*, at 62–64. The Fed also relies on information gathered during bank examinations, which are conducted at regular intervals by banks' primary regulators. For example, Wells Fargo is primarily regulated by the Office of the Comptroller of the Currency, which conducts a "[f]ull-scope, on-site review" of each bank in its purview every 12–18 months and also frequently reviews each bank's compliance with specific federal laws or regulations. *See Examinations: Overview*, Office of the Comptroller of the Currency, http://www.occ.treas.gov/topics/examinations/examinations-overview/index-examinations-overview.html (last visited May 4, 2016).

## B. Wells Fargo's Alleged Fraud

Notwithstanding this regulatory oversight, the relators allege that Wachovia and World Savings Bank engaged in massive fraud in the early-to-mid-2000s, before Wachovia merged into Wells Fargo. According to the relators,

Wachovia's executives relied on improper accounting practices to hide toxic assets off its balance sheet, making the bank look more profitable and in better financial health than it was. In reality, the relators allege, Wachovia was severely undercapitalized. Similarly, the relators assert that World Savings Bank violated applicable laws and regulations by failing to put in place required internal controls and by making inappropriate loans.

Both relators claim to have witnessed these misdeeds firsthand. Robert Kraus was a controller for two Wachovia groups from June 2005 to September 2006; Paul Bishop was a residential mortgage salesperson for World Savings Bank from November 2002 to May 2006. Each was fired after he complained internally about the bank's improprieties. Kraus also reported his allegations of fraud to the Federal Bureau of Investigation in 2007 and to the Securities and Exchange Commission ("SEC") in 2009. Bishop likewise reported his allegations of fraud to the SEC. It does not appear that either agency took action as a result.

The bulk of the relators' complaint is spent detailing those fraud allegations, but they are not the subject of this suit. Rather, the relators' FCA claims rest on their assertion that every time Wachovia and, eventually, Wells

11

Fargo attempted to borrow money from the Fed's discount window, including through TAF, the banks had to make certain representations and warranties contained in the Fed's Operating Circular No. 10 (the "Lending Agreement"). The relators argue that Wachovia and Wells Fargo could not have truthfully made three of those representations as a consequence of the underlying fraud:

Section 9.1: The Borrower represents and warrants that . . .

(b): the Borrower is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and *is not in violation of any laws or regulations in any respect which could have any adverse effect whatsoever upon the validity, performance or enforceability of any of the terms of the Lending Agreement*; . . .

(g): no statement or information contained in the Lending Agreement or any other document, certificate, or *statement furnished by the Borrower to the Bank or any other Reserve Bank for use in connection with the transactions contemplated by the Lending Agreement*, on and as of the date when furnished, is untrue as to any material fact or omits any material fact necessary to make the same not misleading, and the representations and warranties in the Lending Agreement are true and correct in all material respects; . . .

(i): no Event of Default has occurred or is continuing.

J.A. 204–05 (emphasis added). The Agreement stipulates that an "Event of Default" occurs when the bank fails to repay obligations as they become due, becomes insolvent, fails "to perform or observe any of its obligations or

12

agreements under the Lending Agreement," or submits a "representation or warranty . . . under or in connection with the Lending Agreement . . . [that] is inaccurate in any material respect on or as of the date made or deemed made." J.A. 196. Section 9.2 of the Lending Agreement provides that "[e]ach time the Borrower requests an Advance, incurs any Indebtedness, or grants a security interest in any Collateral to a Reserve Bank, the Borrower is deemed to make all of the foregoing representations and warranties." J.A. 205.

The relators contend that when Wachovia and, post-merger, Wells Fargo borrowed money from the discount window from 2007 through 2011, knowing they were "in violation of" banking "laws or regulations," per Section 9.1(b), they were making false statements for the purpose of obtaining government funds. Similarly, the relators argue that because the financial documents the Fed relied on in making its determination that the banks were eligible for the primary rate were "untrue" or "misleading," the banks' Section 9.1(g) representations were fraudulent. As a result, the relators also allege that the banks lied in certifying compliance with Section 9.1(i) because their other representations were materially "inaccurate." Although all of the underlying fraud alleged in the complaint took

13

place in or before 2006, the relators claim that the fraud was of such a magnitude that Wells Fargo could not have been in compliance with applicable laws and regulations when the complaint was filed in 2011.

### C. Procedural Background

The relators filed this action against Wells Fargo and its subsidiaries and affiliates under seal in November 2011, and eventually filed two amended complaints. After the government declined to intervene, the relators filed a third amended complaint. They sought to recover the treble damages and civil penalties provided by the FCA—nearly $900 billion—for false claims filed by Wachovia and Wells Fargo from 2007 through the date they filed the initial complaint. The relators listed some of the payments in an appendix to their complaint, but did not detail each fraudulent loan request.

The defendants filed a motion to dismiss for failure to state a claim under Rule 12(b)(6) and for failure to plead fraud with particularity under Rule 9. The district court granted the motion, dismissing all of the relators' claims with prejudice and denying leave to amend. The relators have appealed some of those claims to this Court.

## STANDARD OF REVIEW

We review a district court's grant of a motion to dismiss under Rule 12(b)(6) *de novo*, "accepting as true the factual allegations in the complaint and drawing all inferences in the plaintiff's favor." *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015). We review a district court's decision to deny a motion to amend for abuse of discretion. *See Spiegel v. Schulmann*, 604 F.3d 72, 78 (2d Cir. 2010).

This Court has held that FCA claims fall within the scope of Rule 9(b), which requires that plaintiffs "state with particularity the specific statements or conduct giving rise to the fraud claim." *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1477 (2d Cir. 1995). Pleadings subject to Rule 9(b) must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

DISCUSSION

## A. The False Claims Act

As noted at the outset of this opinion, the FCA prohibits "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval" to the United States government. 31 U.S.C. § 3729(a)(1)(A). Accordingly, to prove their claims under the FCA, the relators "must show that defendants (1) made a claim, (2) to the United States government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Mikes*, 274 F.3d at 695.[1] The parties do not dispute that the banks' requests for loans through the discount window constitute claims to the United States government seeking payment from the federal treasury. But the defendants contend, and the district court found, that those claims were not "false or fraudulent" within the meaning of the FCA. The Act does not define either term.

The FCA was enacted in 1863 to combat fraud by defense contractors during the Civil War. *See, e.g.*, Paul E. McGreal & DeeDee Baba, *Applying Coase to Qui Tam Actions Against the States*, 77 Notre Dame L. Rev. 87, 121 (2001) ("Army

---

[1] Congress amended the FCA in 2009, but the changes to the statute do not materially alter our analysis of the issues involved in this case.

officers had reported numerous incidents where the federal government had paid for certain supplies only to receive defective goods or nothing at all."). Consistent with its origin, the archetypal FCA claim involves a factually false request for payment from the government, as when a contractor delivers a box of sawdust to the military but bills for a shipment of guns. *See* Michael Holt & Gregory Klass, *Implied Certification Under the False Claims Act*, 41 Pub. Cont. L.J. 1, 16 (2011). Over time, courts have extended the FCA's reach to "legally false" claims, those in which "a party certifies compliance with a statute or regulation as a condition to governmental payment," but is not actually compliant. *Mikes*, 274 F.3d at 697. In 1994, the Federal Court of Claims broadened the definition of a false claim even further to include "impliedly false" claims, where the submission of the claim itself is fraudulent because it impliedly constitutes a certification of compliance. *See Ab–Tech Constr., Inc. v. United States*, 31 Fed. Cl. 429, 434 (1994), *aff'd without written opinion*, 57 F.3d 1084 (Fed. Cir. 1995). Other courts adopting this theory of liability, including this one, have warned about its potentially "expansive" reach. *See, e.g.*, *Mikes*, 274 F.3d at 699 ("[C]aution should be exercised not to read this theory expansively and out of context.").

17

From its enactment, the FCA has encouraged private citizens to report fraud by promising a percentage of any eventual recovery. *See* McGreal & Baba *supra*, at 121. Under the current version of the statute, each false claim exposes the perpetrator to "a civil penalty of not less than $5,000 and not more than $10,000 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). *Qui tam* relators are eligible to receive up to 30% of the government's total recovery, in addition to any expenses, fees, or costs incurred in bringing the suit. 31 U.S.C. § 3730(d)(2).

## B. Relators' Express Certification Claims

In this case, the relators allege that Wells Fargo violated the FCA in several ways: by making express false certifications under Sections 9.1(b), (g), and (i) of the Lending Agreement; by making an implied false certification under Section 9.1(b); by fraudulently inducing the government to lend to it; and by conspiring to submit false claims. The district court determined that the relators did not meet their burden to show that the defendants violated the FCA. We agree and address each claim in turn below.

### a. Section 9.1(b) of the Lending Agreement

The district court first dismissed the relators' claim that the defendants made an express false certification under Section 9.1(b) of the Lending Agreement. The relators allege that the defendants' underlying fraud made it impossible for the banks to certify that they were "not in violation of any laws or regulations" when they borrowed from the discount window. The district court determined that Section 9.1(b) is too broad to give rise to a claim under the FCA, based on this Court's holding in *Mikes*.

In *Mikes*, this Court affirmed the dismissal of a *qui tam* suit alleging that a medical practice had violated the FCA by submitting Medicare reimbursement requests for procedures that did not meet the requisite standard of care. This Court clarified that the FCA was not intended to police general regulatory noncompliance; "it does not encompass those instances of regulatory noncompliance that are irrelevant to the government's disbursement decisions." *Mikes*, 274 F.3d at 697. Thus, we held that "not all instances of regulatory noncompliance will cause a claim to become false." *Id*. This Court then rejected the relator's claims of express and implied false certification.

19

For an express false certification, the *Mikes* Court held that the plaintiff must allege that the defendant submitted "a claim that falsely certifies compliance with a *particular* statute, regulation or contractual term, where compliance is a prerequisite to payment." *Id.* at 698 (emphasis added). Following *Mikes*, this Court has not addressed how narrow a certification of compliance must be to constitute an express false claim, nor to our knowledge has any court considered whether a provision of the Fed's Lending Agreement can serve as the basis for an FCA claim. But, as the district court noted, other district courts in this circuit have frequently rejected FCA claims that are too broad or vague. *See, e.g., United States ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 652 (S.D.N.Y. 2011) ("[A] claim that there has been an express false certification cannot be premised on anything as broad and vague as a certification that there has been compliance with all 'federal, state and local statutes, regulations, [and] policies.'"); *United States ex rel. Colucci v. Beth Israel Med. Ctr.*, 785 F. Supp. 2d 303, 315 (S.D.N.Y. 2011) ("General certifications of compliance with the law are insufficient."), *aff'd sub nom. Colucci v. Beth Israel Med. Ctr.*, 531 F. App'x 118 (2d Cir. 2013). Other circuit courts have held similarly. *See, e.g., United States ex rel. Steury v. Cardinal Health,*

20

*Inc.*, 625 F.3d 262, 268 (5th Cir. 2010) (citations omitted) ("We have thus repeatedly upheld the dismissal of false-certification claims (implied or express) when a contractor's compliance with federal statutes, regulations, or contract provisions was not a 'condition' or 'prerequisite' for payment under a contract. This prerequisite requirement seeks to maintain a 'crucial distinction' between punitive FCA liability and ordinary breaches of contract."); *United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1219 (10th Cir. 2008) (rejecting an FCA claim where the certification "contains only general sweeping language and does not contain language stating that payment is conditioned on perfect compliance with any particular law or regulation").

On appeal, the relators attempt to distinguish between statutory and contract-based certification claims. They argue that we should analyze the relevant provision here under principles of contract interpretation, rather than look to a specific statute or regulation. They point to the Tenth Circuit's analysis in *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1171 (10th Cir. 2010), in which that court concluded that a certification of compliance with "all contractual requirements" was not too broad to support an FCA claim. We do

21

not find this reasoning persuasive. Even though the Lending Agreement is a contract, Section 9.1(b) does not require banks to certify compliance with all contractual requirements, as was the case in *Lemmon*. Rather, the Lending Agreement requires banks to certify compliance with "*any laws or regulations* in any respect which could have any adverse effect whatsoever upon the validity, performance or enforceability of any of the terms of the Lending Agreement." The universe of potentially applicable laws or regulations is vast, compared to the finite number of potential requirements in a contract, as the district court observed. *See United States ex rel. Kraus v. Wells Fargo & Co.*, 117 F. Supp. 3d 215, 222 (E.D.N.Y. 2015) ("Without considering whether [*Lemmon*'s] ruling is correct in the context of a contract, where it makes at least some sense (because there is obviously a limit to how many terms that would refer to), it is not the same as a certification of compliance with any statute or regulation—a certification that is potentially limitless in scope.").

Second, the relators assert that Section 9.1(b) is not "overbroad" because the "law or regulation" alleged must "have an adverse effect on the validity, performance, or enforceability of the terms of the Lending Agreement." *See*

22

Relators' Br. at 41 (emphasis omitted). We are not persuaded that the latter phrase

sufficiently cabins the sweep of the provision. As noted, banks are subject to

thousands of laws and regulations that could plausibly affect the "validity,

performance, or enforceability of the terms of the Lending Agreement," from

banking-specific laws and regulations like the Bank Secrecy Act or the Volcker

Rule to more general ones applicable to any corporation, including employment

or tax laws. Reading this provision as the relators urge would give rise to "exactly

the kind of overbroad certification requirement" that we have previously rejected.

*Kraus*, 117 F. Supp. 3d at 222.

The relators next assert that any other interpretation of Section 9.1(b) would

be at odds with "banking industry customs and practices," which typically

require "individual borrowers [to] provide representations and warranties in

their lending agreements with banks, similar to the representations and

warranties in the Lending Agreement." Relators' Br. at 43. But the Fed is not a

typical commercial lender, and borrowing banks are not typical loan customers:

For one, the Fed's purpose in lending to banks is different from a commercial

lender's purpose in lending to individuals. The Fed's mission is to ensure the

stability of the nation's monetary and financial system. *The Fed. Reserve System: Purposes and Functions supra*, at 1. Nowhere in the Fed's mission statement does it mention earning a profit from its lending activity, and its actual income from loans is negligible. *See* Bd. of Governors of the Fed. Reserve Sys., *101st Annual Report* at 307 (2014). Moreover, the Fed already has a wealth of information about each bank before any request for a loan is made, given the Fed's access to information obtained by the bank's other supervisors. That contrasts with the typical lending transaction, where a bank has only the information provided by the borrower at the time of the loan request. In addition, loans through the discount window are usually very short-term, typically overnight. "Banking industry customs and practices" governing longer-term loans between banks and individual borrowers thus do not govern our analysis here.

The relators also argue that the district court's interpretation would lead to the "absurd result" of banks getting a "free pass to make false certifications without repercussions under the FCA." Relators' Br. at 45. This argument is also unavailing. The federal government has many tools other than the FCA at its disposal to discipline banks and to ensure compliance with banking laws and

regulations, ranging from informal reprimands to fines to involuntary termination of a bank's status as an insured depository institution. *See, e.g.*, 12 U.S.C. § 1818(2); *The Fed. Reserve System: Purposes and Functions*, *supra*, at 66–67. Finding no FCA liability here does not give banks a "free pass" to defraud the government.

Moreover, there is a risk to expanding the FCA to cover these claims: It could incentivize individuals to bring suit without regard for the larger implications on the financial system. Permitting *qui tam* plaintiffs like the relators here to proceed on the facts of this case could discourage banks from accessing the discount window out of concern that they might face FCA liability if they are not in compliance with "any law or regulation." The result would be precisely the opposite of the Fed's intentions in changing discount window operations in 2003. *See* Extensions of Credit by Federal Reserve Banks, 67 Fed. Reg. at 67,778; *see also Conner*, 543 F.3d at 1221–22 (under a broad reading of the FCA, "[a]n individual private litigant, ostensibly acting on behalf of the United States, could prevent the government from proceeding deliberately through the carefully crafted remedial process . . . . It would . . . be curious to read the FCA, a statute intended to protect

25

the government's fiscal interests, to undermine the government's own regulatory procedures."); Holt & Klass, *supra*, at 43–44 ("When the federal government brings a suit under the FCA, it has presumably balanced any costs of interference with other regulatory mechanisms against the benefits of recovery under the Act. The *qui tam* plaintiff has little or no reason to take such regulatory interference into account.").

### b. Sections 9.1(g) and (i) of the Lending Agreement

The relators next allege that the defendants violated the FCA by falsely certifying compliance with Sections 9.1(g) and (i) of the Lending Agreement. They acknowledge that to support a claim of express false certification under Section 9.1(g), they must "allege that Defendants provided the Federal Reserve falsified documents or made false statements to the Federal Reserve in connection with borrowing funds." Relators' Br. at 49–50. They have not done so. The documents that the relators submitted to the district court show that Wachovia and Wells Fargo did not need to submit any financial information "in connection with" borrowing through the discount window; thus, the relators cannot show that the defendants violated Section 9.1(g). Further, we agree with the district court that

the relators' allegations are "far too speculative to constitute a well-plead[ed] claim" of fraud. *Kraus*, 117 F. Supp. 3d at 225.

Appendix 3 to the Lending Agreement describes the documents that a bank must submit when it applies for a loan through the discount window: (1) a letter of agreement stipulating that the borrower agrees to the provisions of the Lending Agreement; (2) a certificate attaching copies of documents specifying the official name of the borrower and providing contact information so the Fed can make an effective UCC-1 financing statement; (3) authorizing resolutions, typically from a board of directors, giving the bank the legal authority to borrow from the Fed; and (4) an official OC-10 Authorization List, which lists individuals who are authorized to borrow money on the bank's behalf. J.A. 217–22; 698. The list of required documents does not include or reference the bank's balance sheet or any other detailed financial information. This omission is likely intentional; as noted, one of the Fed's stated purposes in amending the process to access the discount window in 2003 was to reduce the administrative burden on borrowing banks. Banks are required to report financial information to their designated regulators, but that information is used for many purposes, not necessarily "in

27

connection with" the Fed's lending programs. Under the relators' view, a falsehood in any document submitted by a bank to its regulator could lead to FCA liability because that document might be used by the Fed in its later determination of eligibility for lending. To endorse that view would risk substantially broadening the scope of FCA liability and potentially undermining the Fed's ability to maintain the stability of the financial system.

The relators' argument that the defendants falsely certified compliance with Section 9.1(i) depends on the same allegations as their argument that the defendants falsely certified compliance with 9.1(b) and (g), and therefore fails for the same reasons. *See* Relators' Br. at 57 (acknowledging that non-compliance with Section 9.1(i) hinges on a violation of another provision of the Lending Agreement). Put another way, because the relators cannot show that the defendants submitted a "representation or warranty . . . under or in connection with the Lending Agreement . . . [that] is inaccurate in any material respect," they cannot show that the defendants committed an "Event of Default" as defined by the Lending Agreement. J.A. 196.

## C. Relators' Implied Certification Claim

Separate from their express certification claims, the relators also argue that the defendants are liable under the FCA for making implied false certifications under Section 9.1(b). In *Mikes*, this Court warned that "the False Claims Act was not designed for use as a blunt instrument to enforce compliance with all medical regulations—but rather only those regulations that are a precondition to payment—and to construe the impliedly false certification theory in an expansive fashion would improperly broaden the Act's reach." 274 F.3d at 699. Accordingly, this Court held that "implied false certification is appropriately applied only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the provider must comply in order to be paid." *Id.* at 700.

In this case, the district court rejected the relators' implied certification claim, observing that "Relators have not briefed an 'implied false certification' theory in any great depth, nor have they alleged it with any detail." *Kraus*, 117 F. Supp. 3d at 222. The court concluded that the claim was "misplaced," as the relators did not argue that "any of the many alleged violations of laws and

29

regulations that took place at the defendant banks was ever a violation of a statute that governed eligibility for the primary credit program." *Id.* at 223.

On appeal, the relators argue first that the district court erred in dismissing this claim because the defendants' certifications of compliance with Section 9.1(b) constituted a "material condition to payment," and thus their "bad acts went to the heart of the bargain that they negotiated with the Government." Relators' Br. at 23–24. But this Court has never adopted the relators' "heart of the bargain" test for implied false certification claims under the FCA; rather, the relators appear to be referencing the district court's decision in *Mikes*. *See United States ex rel. Mikes v. Straus*, 84 F. Supp. 2d 427, 436 (S.D.N.Y. 1999) ("I cannot conclude that compliance with 1320c–5 lay 'at the heart of' Defendants' agreement with Medicare. Mikes therefore cannot rely upon the implied certification theory to satisfy the second element of her FCA claim."). This Court did not adopt that test in affirming the district court's judgment, and we decline to do so now.[2]

---

[2] The relators cite this Court's decision in *Mikes* for the proposition that "certain representations are so key to an agreement that they are clearly conditions for payment and that failing to comply with these representations 'may be actionable under § 3729 [of the False Claims Act], regardless of any false certification conduct.'" Relators' Reply Br. at 9 (quoting *Mikes*, 274 F.3d at 703). But they fail to acknowledge that the quoted text in *Mikes* referred to a worthless services claim, where a plaintiff alleges that a defendant

In the alternative, the relators contend that they have complied with *Mikes'* express statement requirement. They point to the Federal Reserve Act and its accompanying regulations, particularly Regulation A, as expressly incorporated in the Lending Agreement. But Regulation A governs the Fed's authority to lend to banks. *See* 12 C.F.R. pt. 201. By its plain terms, it does not apply to the banks themselves, and nowhere do the relators allege that banks were required to submit any financial information in connection with borrowing from the discount window. It is true, as the relators point out, that the Fed could not have made decisions about the banks' eligibility to borrow without examining their financial statements, but the tangential relationship between banks' submission of documents to regulators and the Fed using that information to determine eligibility at some later point is not sufficient to support liability under an implied certification claim. *See Mikes*, 274 F.3d at 702.

Recognizing that our holding in *Mikes* likely precludes their implied certification claim, the relators attempt to distinguish that precedent as only applicable to fraud by a healthcare provider. Although the *Mikes* court examined

sought "reimbursement for a service not provided." *Mikes*, 274 F.3d at 703. The *Mikes'* court expressly characterized these types of claims as "distinct" from false certification claims. *Id.* There is no analogous allegation in this case.

31

the meaning of the FCA within the context of alleged Medicare fraud, we do not read the text of the opinion to limit its holding to the healthcare industry. *See United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113-14 (2d Cir. 2010) (applying the holding in *Mikes* to a case involving an elevator manufacturer), *rev'd on other grounds*, 563 U.S. 401 (2011). *But see United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1177 (9th Cir. 2006) (distinguishing *Mikes* as limited to Medicare claims); *United States ex rel. Feldman v. City of New York*, 808 F. Supp. 2d 641, 653-54 (S.D.N.Y. 2011) (same).

Another reason for not limiting the holding in *Mikes* to healthcare fraud is that some of the same concerns raised by the Court in that case are also relevant to the banking industry. In *Mikes*, this Court observed that "a limited application of implied certification in the health care field reconciles, on the one hand, the need to enforce the Medicare statute with, on the other hand, the active role actors outside the federal government play in assuring that appropriate standards of medical care are met." *Mikes*, 274 F.3d at 699–700. As the relators argue, federalism issues may not be as relevant to the already federally-regulated banks as they were in the healthcare context, but the same concern about the "active

32

role" of other actors is just as pertinent here. As with Medicare, there are other actors involved in regulating banks who are better suited to "assuring that" banks comply with applicable laws and regulations while at the same time ensuring that the entire banking system remains stable. The Fed, which has the discretion to lend to banks if it determines that doing so helps to maintain a functioning economy, is more likely the best party to enforce its own requirements. *Cf. United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 712 (7th Cir. 2015) (citations omitted) ("The FCA is simply not the proper mechanism for government to enforce violations of conditions of participation. Rather, under the FCA, evidence that an entity has violated conditions of participation after good-faith entry into its agreement with the agency is for the agency—not a court—to evaluate and adjudicate."(citation omitted)); *Raichle v. Fed. Reserve Bank of N.Y.*, 34 F.2d 910, 915 (2d Cir. 1929) ("It would be an unthinkable burden upon any banking system if its open market sales and discount rates were to be subject to judicial review. Indeed, the correction of discount rates by judicial decree seems almost grotesque, when we remember that conditions in the money market often change from hour to

hour, and the disease would ordinarily be over long before a judicial diagnosis could be made.").

Lastly, the relators contend that applying *Mikes'* express statement rule to this case would be contrary to the FCA's goal of punishing any fraud against the government. But this argument ignores the explicit statements from the Supreme Court and other courts clarifying that the FCA does not sweep so broadly. *See, e.g.*, *McNinch*, 356 U.S. at 599 ("[I]t is . . . clear that the False Claims Act was not designed to reach every kind of fraud practiced on the Government."); *Steury*, 625 F.3d at 268 ("The FCA is not a general 'enforcement device' for federal statutes, regulations, and contracts."(quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997))).

## D. Relators' Fraudulent Inducement and Conspiracy Claims

The relators next contend that the district court's failure to address their fraudulent inducement and conspiracy claims warrants reversal. We conclude that the court's decision not to address either of these claims does not constitute reversible error. These claims are merely derivative of the relators' other claims. Especially under these circumstances, the district court was not required to

respond in detail to each argument made by the relators. *See, e.g.*, *Malbon v. Penn. Millers Mut. Ins. Co.*, 636 F.2d 936, 939 n.8 (4th Cir. 1980) ("It is, of course, not absolutely necessary, that a judge, in disposing of a motion, specifically recite or otherwise discuss each contention advanced by the parties."); *cf.* Fed. R. Civ. P. 52(a)(3) ("The court is not required to state findings or conclusions when ruling on a motion under Rule 12 . . . .").

Although it would perhaps have been preferable for the district court to discuss its reasoning in dismissing these claims, the relators present no reason on appeal why their fraudulent inducement claim is distinct from their other claims and would not fail for the same reasons. Likewise, under the facts of this case, the relators cannot show a conspiracy to commit fraud given that they have not sufficiently pleaded fraud under the FCA. Their appellate briefing simply states that the district court failed to address their claims without providing any argument in support of the merits. "Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal. . . . [M]erely incorporating by reference an argument presented to the district court, stating an issue without advancing an argument, or raising an issue for the first time in a

reply brief likewise did not suffice." *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).

### E. Leave to Amend the Third Amended Complaint

Finally, the relators argue that the district court abused its discretion in denying their request for permission to file a fourth amended complaint, although they did not file a formal motion for leave to amend. The district court determined that any amendments would be "futile" because "their expansive theory of FCA liability simply is not viable. The facts plead[ed] do not suggest that any further information available to relators will change that." *Kraus*, 117 F.Supp. 3d at 228. As the district court determined, it is apparent from the Lending Agreement which documents needed to be included with the application for borrowing, so there is no need for the relators to "discover" which precise documents the defendants submitted. The relators have not indicated how permitting them to file a fourth amended complaint now will change the outcome of the case.

**CONCLUSION**

For the foregoing reasons, we conclude that the relators have not sufficiently pleaded their claims under the False Claims Act, and we accordingly AFFIRM the district court's dismissal of their complaint.